# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| GARY A. AGAN, | |
| Plaintiff, | No. C11-3061-MWB |
| vs. | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | |
| Defendant. | |

---

### *Introduction*

The plaintiff, Gary A. Agan, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Agan contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that he is not disabled. For the reasons that follow, the undersigned recommends that the Commissioner's decision be **affirmed**.

### *Background*

Agan was born in 1960, has a high school education, and previously worked as a welder, assembler, mechanic and sheet metal installer. AR 32-34, 161, 196, 215-24, 262. On April 22, 2009, Agan applied for DIB and SSI, alleging disability beginning on July 22, 2008 due to a back injury, diabetes, a foot injury and gout. AR 161, 191, 195. The Commissioner denied Agan's applications initially and again on reconsideration. AR 58-61. Agan requested a hearing before an Administrative Law Judge ("ALJ"). AR 74. On April 25, 2011, ALJ Jeffrey Marvel held a hearing at

which Agan and a vocational expert ("VE") testified. AR 28-57. On May 25, 2011, the ALJ issued a decision finding Agan not disabled since the alleged onset date of disability of July 22, 2008. AR 10-27. Agan sought review of this decision by the Appeals Council, which denied review on September 7, 2011. AR 1-6. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On November 10, 2011, Agan filed a complaint in this court seeking review of the ALJ's decision. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues, and the matter is now fully submitted.

## Summary of Medical Evidence

### A. Dr. Mark Palit

Beginning in February 2005, Agan went to see Dr. Palit for low back and right leg pain that had lasted for three months. AR 496. Agan explained that the pain extended all the way down to his foot and was aggravated by increased activity. *Id.* He described the pain as sharp and shooting and chiropractic care provided minimal relief. *Id.* Dr. Palit ordered x-rays of Agan's spine which showed decreased disc height, mildly, at L5-S1. *Id.* Upon physical examination, the doctor noted that Agan walked slowly but steadily, favoring the right leg. *Id.* He found that Agan's range of motion of the lumbar spine was reduced on flexion and extension and the straight leg raise was positive on the right. *Id.* Palpation of the lower lumbar spine produced mild discomfort. *Id.* Agan was diagnosed with lumbar radiculopathy and prescribed a pain reliever. *Id.* An MRI scan was also scheduled.

At a follow-up two days later, Dr. Palit found that the MRI revealed lateral recess stenosis at L4-L5. AR 494. He recommended an epidural steroid injection and referred Agan to the Pain Center. *Id.* Agan was released to light duty work. *Id.*

In March 2005, Agan reported that he was doing about "30-40% better" after his injection. AR 494. After a second injection, he claimed that he experienced no relief and he continued to have ongoing pain described as sharp and shooting, which was aggravated by increased activity. AR 493. Dr. Palit recommended L4-5 decompression surgery, which was performed on April 22, 2005. AR 492-93.

After the lumbar decompression, Agan reported on May 5 that his right leg pain had been resolved, but now he experienced left leg pain down to his foot with a burning sensation. AR 492. Dr. Palit instructed Agan to continue walking, progressing from a walker to a cane. *Id.* He prescribed Amitriptyline and Ibuprofen. *Id.*

Agan returned for a follow-up in June 2005. Because he still complained of left leg pain, the doctor ordered another MRI with a contrast agent. AR 491. This MRI revealed mild residual stenosis at L4-5 with a very mild disc bulge. *Id.* Dr. Palit referred Agan to another doctor for a left L4 selective nerve root block. *Id.* After that injection, Agan reported minimal pain. AR 489. His work duties were advanced to 5.5 hours per day. *Id.* In July 2005, Agan reported he was doing well and returned to regular work duty. AR 489.

### B. Dr. Mohamed K. Youssef

On January 3, 2007, Agan began seeing Dr. Mohamed Youssef, at Trinity Regional Medical Center in Fort Dodge, Iowa for back pain that radiated down both legs. AR 353. He was given an epidural steroid injection at L5-S1. AR 352. The treatment notes indicate Agan had a previous epidural steroid injection in October 2006 and experienced good pain relief. *Id.* Agan returned for another injection on April 20, 2007. AR 349-51. During this visit the nurse prepared a report asking Agan to identify how much his chronic pain limited his ability to perform certain activities. AR 351. Agan listed the following activities as limited a lot: climbing stairs, kneeling or bending, getting out of the house, and pursuing hobbies or other recreational activities. He also claimed to get 50 percent less sleep than usual due to his pain. *Id.*

On April 29, 2007, Agan reported to the emergency room at Pocahontas Community Hospital with symptoms of increased thirst, increased urination during the night, and dizziness. AR 427-29. The nurse noted that he was a newly diagnosed diabetic and his glucose was elevated. *Id.* Agan was admitted to acute care. He was given diabetic education and started on insulin. *Id.* He returned to half-days at work on May 8 and full-time on May 22. AR 451.

Agan received additional lumbar epidural steroid injections from Dr. Youssef. On July 25, 2007, he still complained of continued low back pain radiating down both legs. AR 347. He reported that climbing stairs, getting in or out of bed or a chair, and pursuing hobbies or other recreational activities were limited a lot by his pain and he was getting 50 percent less sleep than usual. AR 348. He was given epidural steroid injections on that date and again on October 5, 2007. AR 342-45. Dr. Youssef noted Agan had experienced excellent pain relief from this procedure in the past. AR 342.

On November 28, 2007, Agan agreed to a spinal cord stimulator trial. AR 337-38. At this visit, he told the nurse that activities such as working with his hands, performing tasks at work, and visiting with family and friends were also now limited a lot by his pain in addition to the activities previously identified. AR 341. After the spinal cord stimulation lead was inserted, Agan reported a numbing, tingling sensation covering the area of pain and was very satisfied with the current stimulation. AR 337.

At a follow-up on December 3, 2007, Agan reported excellent pain relief from the spinal cord stimulator trial, with about an 80 percent decrease in pain. AR 330. Agan explained that he was more active throughout the trial and able to sleep through the night without waking up. *Id.* Dr. Youssef's impression was that Agan's pain had been secondary to lumbar degenerative disc disease, a herniated lumbar disc, and lumbar radiculopathy. *Id.*

## C. Dr. Cassim Igram

Dr. Youssef recommended that Agan see Dr. Igram at the Iowa Ortho Center regarding his chronic lumbar radiculopathy. AR 264-65. Agan reported that nothing had adequately addressed his pain except the recent spinal cord stimulator trial and he was interested in pursuing a permanent implant. AR 264. He stated that daily activity made his pain worse. *Id.* Upon physical examination, Dr. Igram noted that flexion and extension were limited and Agan had some stiffness with these maneuvers. *Id.* Agan also had breakaway weakness to motor testing in both lower extremities with sensory deficit in a non-dermatomal pattern in the right lower extremity. *Id.*

On December 24, 2007, Dr. Igram performed a thoracic laminectomy for placement of a permanent spinal stimulator. AR 266. Agan was instructed to have the stimulator programmed by doctors in Fort Dodge and he was released to return to work on January 4, 2008. AR 269.

On January 11, 2008, Agan returned to Trinity Regional Medical Center in Fort Dodge reporting pain in his low back and right leg. AR 327. He claimed he was not getting adequate coverage in his lower back from the spinal cord stimulator. *Id.* Agan was referred back to Dr. Youssef in the Pain Clinic to reprogram the stimulator. *Id.* After attempting several different programs that did not provide coverage to the painful area in Agan's back, Dr. Youssef concluded that Agan needed to see Dr. Igram again to discuss repositioning the stimulator. AR 323-24.

## D. Dr. Russell Buchanan

On March 27, 2008, Dr. Buchanan began evaluating Agan at the Iowa Spine and Brian Institute. AR 291-92. Agan reported constant pain in his low back that was improved with lying down. He claimed the pain was worse when sitting for a prolonged period. *Id.* Dr. Buchanan noted that Agan had some difficulty walking on heels and toes due to bilateral lower extremity pain. He also had difficulty squatting to

regain standing and flexing forward to touch his knees to regain standing. *Id.* Agan was working as a welder at this time. *Id.* Dr. Buchanan ordered a CT scan. *Id.*

Dr. Buchanan reviewed the CT scan results with Agan in mid-April. He found that the scan demonstrated facet degeneration at L4-L5 that was "quite severe" and that could be the possible generator of pain. AR 287. He ordered discography to determine whether Agan's dorsal column stimulator leads needed to be re-positioned. *Id.*

Dr. Robert Federhofer performed the discography and stated it was his impression that Agan had "definite diskogenic pain at the L5-S1 level and probable diskogenic pain at the 4-5 lumbar level." AR 312.

Dr. Buchanan saw Agan again on June 26, 2008. AR 283-84. He noted that Agan had difficulty achieving a standing posture and when he did, he had a flex posture at the waist. He noted that Agan could not straighten up without significant low back pain. Although Agan was able to walk on his heels and toes, he had difficulty squatting to regain standing and flexing forward to touch his knees. *Id.* Based on the findings of the discography study and the morphology of disks, Dr. Buchanan suggested surgery. *Id.*

On July 22, 2008, Dr. Buchanan performed a lumbar interbody fusion at L4-L5 and L5-S1 with interbody cage placement and anterior plating. AR 306-09. The spinal cord stimulator was also removed. AR 307. During the surgery Dr. Buchanan found severe disc degeneration at L5-S1 with significant disc collapse and loss of integrity of the structure of the disc as well as the cartilaginous endplate. AR 306. He noted the L4-5 disc appeared hardier and somewhat healthier with the exception of a central area of the disc that demonstrated severe deterioration. AR 306.

Agan reported to Trimark Pocahontas Family Practice on August 6, 2008, to have suture removal from his back surgery. He also saw a physician for gout in his left foot and arthritis in his right ankle. At that time, he also indicated that he stopped taking Avandia for his diabetes because of the cost. AR 443.

On September 8, 2008, Agan reported for a follow-up exam at the Iowa Spine and Brain Institute. He stated he was doing very well in terms of pain control and was not experiencing any of the leg pain he had before the surgery. AR 279. He indicated that he still wore a bone stimulator on a daily basis and the physician assistant encouraged him to continue this. AR 280. Agan inquired about when he could return to work. *Id.* The physician assistant recommended physical therapy three times per week for two weeks followed by work hardening for two weeks at which time they could evaluate whether he was ready to return to work. *Id.*

A month later, Agan stated that physical therapy had helped and that he was doing better apart from some occasional stiffness. AR 275. He stated he did not have any pain in his legs. *Id.* His gait was coordinated and smooth and he was able to walk on his heels and toes. He could squat and regain a standing position without difficulty and could touch his knees while flexing forward. *Id.* Agan was released to work 4.5-hour days with no lifting over 30 pounds and limited bending and twisting. *Id.*

Agan reported to the emergency room at Pocahontas Community Hospital on October 19, 2008, stating he had tripped and fell, exacerbating his chronic low back pain. AR 400. Agan stated the pain was so severe he had difficulty getting back to his chair. *Id.* Agan was out of pain medication at this time. After a physical examination, the physician noted Agan's motor skills and reflexes of the lower extremities were normal. The physician also noticed some mild sensory deficits consistent with diabetic peripheral neuropathy. *Id.* Agan was given a pain reliever and a note off work the next day. *Id.*

Agan was back to working full-time in November 2008. At a follow-up exam, he stated he was still experiencing constant back pain of 7 out of 10, but no pain in his legs. AR 271. He said he was doing exercises at home, walking, and was continuing to wear the bone stimulator. *Id.* The physician assistant suggested another injection in an effort to relieve some of the pain near Agan's right SI joint. AR 272.

Dr. Youssef administered the bilateral sacroiliac injection on November 14, 2008. AR 315. The nurse's notes indicate that Agan had been laid off for missing work. AR 317. Agan described his pain level as 6 out of 10 and said his pain kept him from doing activities such as climbing stairs, performing housework, and pursuing hobbies or other recreational activities. AR 318. Other activities that were limited due to his pain included walking, kneeling or bending, bathing or dressing himself, getting in or out of bed or a chair, preparing meals, visiting with family or friends, and getting out of the house. AR 318.

### E. United Community Health Center

On February 10, 2009, Agan sought treatment at United Community Health Center ("UCHC") in Storm Lake, Iowa for back pain and other health issues. AR 390. On March 12, 2009, Agan went to UCHC and complained of back pain. He was prescribed Tramadol.[1] AR 389. He was seen again on April 21, 2009, and prescribed Diazepam.[2] AR 388. On June 25, Agan returned complaining of chronic back pain and diarrhea. AR 386. He had run out of Tramadol a week earlier and was taking an extra dose of Diazepam each day. *Id.* Both prescriptions were re-filled at this appointment. *Id.* The nurse practitioner noted that he ambulated slowly and had difficulty getting up and down from the examination table. *Id.*

On July 14, Agan reported that he continued to have diarrhea and abdominal pain. AR 385. The nurse practitioner noted that Agan was under stress as his unemployment was about to run out. She also noted he was depressed and that he had applied for disability benefits. *Id.* She prescribed an anti-depressant. Agan missed a

---

[1] Tramadol is prescribed for the "management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." *Physician's Desk Reference* 2694 (64th ed. 2010).

[2] Diazepam is used to treat mild to moderate anxiety, some types of seizures, muscle spasms, nervous tension, and symptoms related to alcohol withdrawal. It is in the class of drugs known as benzodiazepines and is commonly sold under the brand name Valium. MARK MITCHELL ET AL., THE GALE ENCYCLOPEDIA OF MENTAL HEALTH 489 (Kristin Key, ed., 3rd ed. 2012).

scheduled appointment at the beginning of August, but on August 28 he reported to the clinic with chest discomfort. AR 383. He explained that he had been doing yard work the week before and developed pain in his left lower chest wall. *Id.* The nurse practitioner assessed it as muscle strain and prescribed an anti-inflammatory. *Id.* On September 9, Agan saw the nurse practitioner for refills of his pain medications. She examined Agan finding tenderness around his spine and refilled his medications. She also noted Agan's depression was stable. AR 381.

On September 28, Agan visited Trimark Pocahontas Family Practice and reported a sudden onset of low back pain radiating down his right leg after lifting a chair. AR 433-34. The doctor assessed Agan with lumbar strain and prescribed a muscle relaxant. Days later, Agan reported to UCHC with the same complaint from the same incident. AR 380. He was prescribed a narcotic pain reliever. *Id.*

On October 6, Agan was taken to the emergency room after attempting suicide. He had taken 10 to 15 Tramadol pills and left a note for his wife. AR 374, 379, 402-03. The doctor noted Agan said it was due to "some bad news he received," but he then "blamed it on his wife and arguments about cooking and various other items." AR 402. He was discharged the next morning with the recommendation to seek counseling. AR 402. His provider at UCHC suggested he immediately begin counseling at Plains Area Mental Health Center.[3] AR 379.

Agan returned to UCHC on November 24 requesting refills of his back pain medication, which were ordered. AR 461. He had a follow-up appointment in December with no new complaints. AR 460. On January 13, 2010, Agan requested refills of his back pain medication again, and they were ordered. AR 459. On February 18, he had a follow-up appointment and stated he felt good. AR 457.

In March, he sought a consultation at UCHC for alcohol abuse. AR 470. Agan told the nurse practitioner he drank alcohol every day for the entire day, estimating he

---

[3] It is unclear whether Agan attended counseling at Plains Mental Health Center. No treatment notes appear in the record.

drank at least a 12-pack of beer per day. *Id.* He claimed that he did not have any alcohol that day, although the nurse noted that he spoke loudly and slurred his speech. *Id.* Agan stated that he had tried to get into an inpatient detoxification center at Fort Dodge, but had to wait two weeks. *Id.*

On April 6, Agan returned to UCHC for sinus congestion, but also mentioned that he was experiencing back pain. He was prescribed Darvocet, a narcotic pain reliever for his back. AR 469.

On April 21, 2010, Agan reported to UCHC stating that he had tried inpatient alcohol treatment in Fort Dodge, but it had not gone well. AR 468. He also stated he had been seeing a counselor at Compass Pointe in Spencer, Iowa. Agan told the nurse practitioner he had lost the medications for his back pain and requested more Darvocet. *Id.* The nurse practitioner offered to call the treatment center, but Agan said he had already contacted the facility. *Id.* They agreed that Agan should not take any more narcotics and the nurse practitioner prescribed an anti-inflammatory instead. *Id.* Agan was educated on the consequences of drug seeking. *Id.*

On May 18, Agan reported to UCHC for a follow-up on his diabetes and a lipid panel. AR 467. The nurse practitioner noted that she educated Agan on his diet and suggested exercise of 30 minutes maximum, five days per week.

On June 8, Agan requested detoxification from alcohol and valium. AR 465. At the time of the visit, the doctor thought Agan had overdosed on benzodiazepines. *Id.* The police were contacted to take Agan to the hospital after he insisted on driving by himself. *Id.*

In August 2010, Agan was referred to the Iowa Heart Center for chest discomfort which had lasted for two weeks. AR 472. Outside of reflux disease, there were no abnormal findings. AR 475.

*F. Orthopaedic & Sports Medicine Specialists, LLC*

In December 2010, Agan began seeing Kristina Johnson, PA-C, for a right hand injury.  AR 488.  He injured his hand after hitting a wall with a closed fist.  *Id.*  He had visited the ER immediately after the injury, where he was x-rayed and his hand placed in a splint.  *Id.*  He told Ms. Johnson that it was causing him pain and he was experiencing numbness and tingling.  *Id.*  Upon physical examination, she found bruising, swelling, and tenderness.  *Id.*  She also noted that Agan was able to flex and extend his wrist very minimally due to the swelling and pain.  *Id.*  She instructed him to start utilizing his hand and doing hand pumps to bring down the swelling.  *Id.*

Upon follow-up for his hand, no changes were noted but Agan still complained of pain.  AR 487.  He was prescribed hydrocodone.  *Id.*  The physician assistant noted that he had significant decreased range of motion with his fingers and wrist and started him on occupational therapy to improve this.  AR 486.  Agan stated that he was still experiencing pain.  *Id.*

Agan met with a surgeon on January 18, 2011 for evaluation of his right hand.  AR 485.  Upon physical examination, the doctor noted there was some bruising and he had tenderness in the mid shaft of the middle finger.  *Id.*  Flexing and extending certain areas of the hand were also limited.  *Id.*  The doctor ordered tests and prescribed a pain reliever with the instruction that this was the last time his office would be giving him any pain medication.  *Id.*

In February, the doctor noted that Agan's hand was unchanged since his last visit.  AR 502.  Agan still complained of discomfort, but the doctor noted, "I am at a loss to find an appropriate diagnosis for his pain and discomfort."  *Id.*  Agan was referred to another hand surgeon for further evaluation and given a final prescription of a pain reliever.  *Id.*

## G. State Agency Medical Consultants

On June 12, 2009, Laura Griffith, D.O., performed a physical RFC assessment. AR 35-62. After reviewing Agan's medical records, she concluded he could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. AR 356. She also thought Agan could sit, stand and/or walk six hours out of an eight-hour workday. *Id.* She estimated that Agan could occasionally climb a ramp or stairs and occasionally perform tasks that required balancing, stooping, kneeling, crouching, or crawling. AR 357. She indicated that he could never be expected to climb a ladder, rope, or scaffolds. *Id.*

In explaining her findings, Dr. Griffith noted that Agan's treating sources indicated he had normal muscle tone and strength. AR 360. While Agan reported that he had constant back pain, she found his credibility somewhat eroded by his failure to seek further care since November 2008. *Id.* She noted that two months after his fusion surgery, he reported that he was doing very well in terms of pain control and the pain he had in his legs was normal. AR 362. She also noted that a physical exam at that time showed Agan had full range of motion in his extremities with normal muscle strength and tone, with physical therapy and work hardening suggested. *Id.* In addition, in November 2008, a month after Agan had been released back to work part-time with a 30-pound lifting restriction, he reported that he had been working full-time but still experienced ongoing back pain. *Id.*

Dr. Griffith also commented on Agan's daily activities. She noted that he takes one-mile walks and lays on the couch. He has no difficulty with personal care, does laundry, and mows the yard. He reported that he could lift 20 pounds. *Id.*

This physical RFC assessment was submitted to Gary Cromer, M.D., on October 1, 2009 for reconsideration. AR 368. Additional allegations of worsening pain, depression, and chronic diarrhea were considered. *Id.* Dr. Cromer noted that new medical evidence included an abdominal ultrasound obtained for hepatomegaly and abdominal pain. *Id.* This test showed only mild hepatomegaly with probable fatty

infiltration, and a small right renal cyst.  *Id.*  An updated report on Agan's activities of daily living and a pain questionnaire were requested, but were never returned.  *Id.*  Dr. Cromer concluded, "Evidence fails to document substantial worsening in physical condition warranting alteration in the initial assessment.  No opinion evidence is noted. The initial assessment, supplemented by this update, remains appropriate and is therefore affirmed."  *Id.*

*Hearing Testimony*

*A. Plaintiff's Testimony*

At the administrative hearing, Agan testified he was 50 years old, graduated from high school and had vocational training in auto mechanics from Lincoln Technical Institute.  AR 32.  He stated he last worked part-time for Wal-Mart in 2009.  He worked in the store's tire and lube center four or five hours a day and four or five days per week.  AR 33.  He held this job for a month, but quit because he could not handle the pain in his back.  *Id.*  Agan also testified that he previously worked as a welder for seven or eight years and as a sheet metal installer.  AR 33-34.  He testified that as a sheet metal installer he carried a tool belt weighing 25 to 30 pounds and would frequently lift objects weighing from 10 to 30 pounds.  AR 34.

Agan testified that he was no longer working because of chronic low back pain. *Id.*  He explained that the pain radiates mainly down his right leg, is constantly present, and increases with movement.  AR 36.  He estimated that the baseline level of pain is about a seven on a scale of ten.  He was seeing a family practitioner for pain management and was treated through medication, but not physical therapy.  AR 44. Agan testified that he had three surgeries on his back.  AR 36.  The first one was a laminectomy in 2005, after which he was able to return to work.  *Id.*  The second surgery was in 2007, when a neurostimulator was placed in his back.  AR 36-37.  Agan was also able to return to work after this surgery.  AR 37.  The third surgery was in 2008 when the stimulator was removed.  AR 37.  Agan returned to work after this

surgery, but stated his employer sent him home after determining he was not performing his job. *Id.* Agan testified that when he tried to return about two weeks later, he was told not to come back. *Id.*

Agan also discussed his other medical problems and the medications he was taking for them. He was taking hydrocodone and Tramadol for his back pain but testified that neither helped much with his pain. AR 38-39. Agan also stated that he treated his diabetes with insulin and that his blood sugar had been high recently with some of the medication he was taking. AR 40. Doctors had told him blood sugar goes up with pain. *Id.* For gout, Agan said he took Allopurinol. *Id.* He informed the ALJ that the problem with his hand was now being attributed to gout in his fingers. *Id.*

Agan's alcoholism and suicide attempts were also discussed. Agan testified that he had stopped drinking alcohol six months earlier and had completed a treatment program. AR 40-41. He admitted that he had overdosed on Valium in June 2010, which had been prescribed for anxiety. AR 41-42. Agan stated that he was still suffering from anxiety and had begun treatment at the Berryhill Center for Mental Health ("Berryhill") for both anxiety and depression five months earlier. AR 42. He stated that he was being treated with Paxil, an anti-depressant. *Id.* Agan estimated that he suffered from anxiety and depression since he lost his job in 2008, and although his medication helped, he still experienced symptoms. AR 43.

During the hearing, Agan rotated between sitting down and standing up. AR 44. When the ALJ asked why he kept changing positions, Agan stated that because of the chronic pain in his back, he was only able to sit in a chair for about 15 to 20 minutes. *Id.* He could then stand or walk around for 15 to 20 minutes before he needed to sit down again. *Id.* Agan testified that he thought he could walk about one block without experiencing pain or discomfort. AR 44-45. He also thought he could stand in one place for about 15 minutes before experiencing pain or discomfort. AR 45. Agan's other limitations included grasping or gripping things due to the gout in his right hand. *Id.*

Agan's activities of daily living were also discussed at the hearing. AR 46. He stated that he tries to maintain the house he lives in with his wife and two daughters as best as he can by loading the dishwasher and doing laundry. *Id.* He stated he is able to take care of his personal needs and can drive, but only for short trips. AR 47. He testified that he goes to the grocery store about once a week with his wife but stays in the car most of the time. *Id.* Agan later clarified that he was only able to get out of the house and do activities on good days and that he experiences approximately 10 to 12 bad days per month. AR 49. He said he uses a walker to get out of bed or off the couch, but he is able to walk without it. AR 48.

### B. VE's Testimony

Marian Jacobs also testified at the hearing. The ALJ asked her to consider four hypotheticals to determine what type of work Agan could perform and if these jobs were available in the regional and national economy. First, the ALJ asked her to consider whether a person could perform any of Agan's past work given the following qualifications and limitations: the same age, education, and past work experience as the claimant, who could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and walk six hours out of an eight-hour day, could sit for six hours out of an eight-hour day, and could occasionally balance, stoop, crouch, kneel, crawl, and climb, but could not climb ladders, ropes, or scaffolding. AR 52. The VE testified that a person with these qualifications and limitations would not be able to perform any of Agan's past work. *Id.* However, she believed a person with the skills the claimant had acquired in his past work could perform the job of order filler in a wholesale company or a parts clerk in a retail store within the limitations of the first hypothetical. AR 52-53. Light unskilled jobs such as an assembler, bottle inspector, or router could also be performed and were available in substantial numbers in Iowa and the United States. AR 53.

For the second hypothetical, the ALJ asked if a person could perform any of Agan's past work if that person could stand and walk only two hours out of an eight-hour workday. The VE answered "no" and stated that no sedentary jobs were available which required the skills the claimant had acquired in his past work. AR 54. As for unskilled sedentary jobs, the VE indicated that dresser and sorter of envelopes and packages, assembler of buttons and notions, and final assembler of optical frames would be appropriate and existed in substantial numbers in the regional and national economy. AR 54-55.

For the third hypothetical, the ALJ asked the VE to consider the sedentary hypothetical with the addition that the person would need to alternate sitting and standing every 15 to 20 minutes. AR 55. The VE stated that such an individual could not perform work in a competitive economy.

Finally, the ALJ had the VE consider the sedentary hypothetical with the additions that the person would need to take more than two unscheduled breaks per day and work at a slow pace for up to one-third of the day. *Id*. The VE testified that such a person could not perform work in a competitive economy. *Id*. She clarified that her answer remained the same regardless of the exertional level or if each of those three limitations were taken singly. AR 56.

### *Summary of ALJ's Decision*

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2) The claimant has not engaged in substantial gainful activity since July 22, 2008, the alleged onset date.

(3) The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, status post lumbar fusion and status post implantation and removal of spinal neurotransmitter.

(4) The claimant does not have an impairment or combination of impairments that meets or medially equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) such that he could lift twenty pound[s] occasionally and ten pounds frequently, and could stand/walk for six hours out of an eight-hour workday. He could sit for six hours out of an eight-hour workday. He can only occasionally balance, stoop, crouch, kneel or climb. He cannot climb ladders, ropes, or scaffolds.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant was born on December 13, 1960 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age.

(8) The claimant has at least a high school education and is able to communicate in English.

(9) The claimant has acquired work skills from past relevant work.

(10) Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

(11) The claimant has not been under a disability, as defined in the Social Security Act, from July 22, 2008, through the date of this decision.

AR 15-21.

In evaluating Agan's impairments, the ALJ considered both mental and physical impairments. The ALJ recognized that Agan's medically determinable mental impairments included alcohol abuse, anxiety, and depression. AR 16. However, he concluded that considered singly and in combination, these did not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and

were therefore non-severe. *Id.* The ALJ used the "paragraph B" criteria set out in 20 CFR, Part 404 Subpart P, Appendix 1, which consists of four broad functional areas. *Id.* He found that in the areas of activities of daily living, social functioning, and concentration, persistence, and pace, Agan had mild limitations from his mental impairments. AR 16. He also found that Agan had no episodes of decompensation of extended duration. *Id.* In making these findings, the ALJ noted Agan's statement to a physician that he drank a 12-pack of beer per day. He also acknowledged that Agan had intentionally overdosed on his medications in October 2009 and in June 2010, but that he was stabilized and released home shortly thereafter. *Id.* In concluding that Agan's mental impairments were nonsevere, the ALJ explained:

> The record reflects minimal treatment for mental health conditions and the brief hospitalizations appear to be isolated events. The claimant's physical conditions appeared to be the focus of treatment notes, with only sporadic mention that the claimant received medication for depression. There are no treatment notes that indicate a mental health specialist has placed any type of limitations on the claimant due to mental health conditions.

*Id.*

The ALJ also addressed Agan's physical impairments, including diabetes mellitus and hyperlipidemia. He concluded that because both of these impairments could be effectively controlled through medication and did not have more than a minimal effect on his ability to perform basic work activities, they were non-severe. AR 16-17.

The ALJ also found that the pain and discomfort in Agan's hand was a non-medically-determinable impairment. AR 17. The ALJ noted that there was no objective medically-acceptable testing that could establish an impairment, and he also relied on Dr. Guatam Kakade's evaluation where he concluded after extensive testing, "I am at a loss to find an appropriate diagnosis for his pain and discomfort." *Id.*

In determining Agan's RFC, the ALJ evaluated the credibility of Agan's subjective allegations. AR 17-19. He found that the record did not fully support the severity of Agan's allegations and that treatment seemed to have resolved or greatly reduced the majority of his complaints, as the medical evidence failed to document a continued pattern of complaints of recurrent symptoms. AR 19. He also found that Agan required little ongoing medical treatment for his back pain, as evidenced by the record. *Id.*

The ALJ gave great weight to the opinions of the State Agency medical consultants' opinions finding that they were internally consistent and consistent with the evidence as a whole. *Id.*

### *Disability Determinations and the Burden of Proof*

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental,

sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the

burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The court will affirm the Commissioner's decision "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).   Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)).   This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)).   The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

### A. Plaintiff's Credibility

Agan argues the ALJ failed to properly evaluate his subjective allegations under *Polaski v. Heckler*.   Specifically, Agan disagrees with the ALJ that the objective evidence fails to support Agan's allegations of disabling pain.   He also argues that the failure to seek ongoing treatment for his back issues should not weigh against his credibility because nothing in the record indicates that additional treatment would have been beneficial.   With regard to his activities of daily living, Agan claims that the limited yard work and housework he performs cannot be considered inconsistent with a claim of disability.   Finally, Agan references his earnings history, arguing that it entitles him to substantial credibility because it demonstrates he is not out to seek benefits to which he is not entitled.

The Commissioner argues the ALJ provided good reasons for his credibility determination, which is supported by substantial evidence in the record. The Commissioner asserts that Agan simply provides an alternative view of the evidence, which is the wrong standard for evaluating the ALJ's credibility findings. The Commissioner elaborates on the evidence supporting the ALJ's credibility determination, pointing out that Agan's daily activities, consisting of mile-long walks and grocery shopping in addition to yard work and housekeeping, came from his own admissions and were sometimes limited due to other non-alleged impairments, such as chest pain. Additionally, the Commissioner references the ALJ's discussion about Agan's drug-seeking behavior, which weighed against his credibility.

In assessing credibility, the ALJ must consider "the claimant's prior work history, daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (citing *Polaski*, 739 F.2d at 1322). The ALJ does not need to discuss each *Polaski* factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009). "If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination." *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010).

In assessing Agan's credibility, the ALJ listed the *Polaski* factors and concluded that after careful consideration of all the evidence "the record does not fully support the severity of the claimant's allegations." AR 19. In reaching this conclusion, the ALJ first noted that in May 2009 Agan said he was able to go on daily walks up to one mile, could lift about 20 pounds, and sit for about ten minutes. AR 18, 206-13. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Halverson*, 600 F.3d at 932 (internal quotation marks and citation omitted). Agan also filled out a questionnaire about his pain and fatigue in

May 2009 in which he stated that to get comfortable he had to lie down, but also claimed standing was the most comfortable position. AR 204-05. At the hearing in April 2011, Agan alleged he was only able to sit or stand/walk for fifteen to twenty minutes at a time and could only walk one block. AR 44-45. ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Even though these assertions occurred nearly two years apart, nothing in the objective medical evidence demonstrates that Agan's alleged impairments worsened during that time.

Although Agan's self-reported daily activities demonstrate some limitations, the lack of significant restrictions imposed by a treating physician weighs against Agan's credibility. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (lack of significant medical restrictions is inconsistent with complaints of disabling pain). Self-imposed limitations without medical support in the record can be a basis for discrediting the claimant's allegations. *See Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether Blakeman was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition *compels* him to nap each afternoon.").

The ALJ's analysis of Agan's daily activities and limitations, as described by Agan himself and contained in the medical evidence, is supported by substantial evidence in the record. As the ALJ acknowledged, Agan went through rehabilitation in October 2008 to recover from his lumbar fusion and neurostimulator removal surgery in July 2008. He was released to work part time and limited to 30 pounds of lifting by his treating physician. AR 275. In November, 2008, Agan complained that he still had low back pain but he was back to working full-time and demonstrated normal movement of all extremities. He was encouraged to continue home exercises and build up his walking to 30 minutes a day. AR 271-72. Other treatment notes in the record also encouraged activity and physical therapy, and no physical limitations were imposed on him. AR 279-80, 283-84, 406-07.

The ALJ also considered the objective medical evidence and whether it corroborated Agan's allegations. The ALJ noted:

> The claimant does have a history of degenerative disc disease, status post surgical intervention. This treatment appears to have resolved or greatly reduced the majority of the claimant's complaints. Although the claimant initially complained of some recurrent symptoms, the medical evidence failed to document a continued pattern of complaints. Significantly, the claimant appears to have required little ongoing medical treatment for back pain. The longitudinal medical record, when viewed as a whole, fully supports the residual functional capacity detailed above.

AR 19. "It is well-settled that an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003). However, absence of objective medical evidence is a factor for the ALJ to consider when determining credibility. *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008). Furthermore, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010).

The ALJ's review of the objective medical evidence is substantially supported by the record. Since Agan's alleged onset date of disability—July 22, 2008—Agan's back pain has been treated with medication and his complaints of back pain correspond with requests for refills of his medication. Immediately after his lumbar fusion surgery, Agan reported that he was doing very well in terms of pain control. AR 279-80. After a month of physical therapy, Agan reported occasional stiffness, but indicated the physical therapy had helped. AR 275-76. Agan did not complain of back pain again until October 2008 when he tripped and fell. He indicated that he was out of pain medicine at the time, was prescribed a pain reliever and given a doctor's note excusing him from work the next day. AR 400. At a follow-up in November 2008 he complained of constant back soreness that he rated as 7 out of 10 in terms of pain, but was back to working full-time. He was prescribed pain relievers, encouraged to continue exercises, and instructed to follow-up in three months. AR 271-72.

In February 2009, Agan began seeing a nurse practitioner at UCHC on a regular monthly basis, but only complained of back pain when he needed refills on his medications. AR 390. He was initially prescribed Lortab, Diazepam, and Tramadol for his back pain. AR 390-91.

In April, Agan indicated that he had taken Diazepam 10 mg twice per day which "helped more" and his Diazepam prescription was increased. AR 388. During an appointment in May, there were no complaints of back pain. AR 387. In June, Agan indicated his Tramadol prescription had run out so he had started taking Diazepam 10 mg three times per day. AR 386. Both prescriptions were refilled. *Id.* In July, Agan did not complain of back pain, but the nurse practitioner noted that he was under stress because his unemployment was about to run out and he had applied for social security disability benefits. AR 385. In August, Agan saw the nurse practitioner for chest pain with no complaints of back pain. AR 383. In September, Agan had complaints of back pain and requested a refill on his medication. AR 381. The nurse practitioner noted Agan's depression was stable at this time. *Id.* In October, Agan saw the nurse practitioner after a sudden onset of back pain radiating down his leg from lifting a chair. AR 380. He was prescribed a pain reliever. *Id.* He had reported to Trimark Pocahontas Family Practice two days earlier for the same injury and was prescribed a muscle relaxant. AR 433-34.

After Agan's intentional overdose on Tramadol in October 2009, his back pain medications were refilled in November. AR 379, 461. In December, he had no reports of back pain. AR 460. In January 2010, Agan indicated he needed a refill on his back pain medication and his prescriptions were refilled. AR 459. In February, he began seeing a new nurse practitioner. AR 457. There were no complaints of back pain noted, but his Diazepam prescription was refilled. *Id.* In March, there were no complaints of back pain. AR 470. In April, he complained of back pain and was prescribed Darvocet. AR 469. Later that month, he returned requesting more Darvocet, indicating he had lost his medications while he was seeking treatment from

an inpatient alcohol detoxification center. AR 468. The nurse practitioner educated Agan on drug seeking and Agan agreed that he should not take narcotics at that time. AR 468.

This pattern seems to indicate either that Agan's back problems were substantially controlled by medication or that he was seeking medication for reasons other than his back pain. Physical examinations at times of complaints mostly revealed tenderness around the spine and on one occasion, difficulty getting up and down from the exam table. AR 380-81, 386, 389, 459. Regardless of the reason for this pattern, there is substantial evidence in the record for the ALJ to find that Agan's subjective allegations were not entirely credible based on the objective medical evidence. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999). Drug-seeking behavior "cast[s] a cloud of doubt" over the legitimacy of a claimant's numerous doctor visits and allegations of disabling pain. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

Agan argues that his daily activities and the objective evidence are consistent with a finding of disability. This argument reflects the wrong standard of review. The court "will disturb the ALJ's decision only if it falls outside the available 'zone of choice.' An ALJ's decision is not outside the 'zone of choice' simply because [the court] might have reached a different conclusion had [the court] been the initial finder of fact." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citing *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). Likewise, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the ALJ's decision. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). The court does "not reweigh the evidence or review the factual record *de novo*." *Roe*, 92 F.3d at 675 (quoting *Naber*, 22 F.3d at 188). As analyzed above, the ALJ's findings of inconsistencies in Agan's daily activities, and the lack of objective

medical evidence to support Agan's impairments is supported by substantial evidence in the record. Therefore, the ALJ's decision is given deference and Agan's argument that the evidence could be viewed to support a finding of disability is of no consequence under the standard of review before this court.

Finally, Agan argues that he was entitled to substantial credibility based on his work history which, he argues, demonstrates that he is not out to claim benefits to which he is not entitled. While a good work history usually weighs in favor of a claimant's credibility, *see Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir. 1984) ("a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability"), continuing to work with an alleged disability and applying for unemployment benefits undermines that credibility. "Working generally demonstrates an ability to perform a substantial gainful activity." *Goff*, 421 F.3d at 792 (citing *Naber*, 22 F.3d at 188-89). A claim for unemployment compensation adversely affects a claimant's credibility because an applicant for unemployment compensation must hold himself out as available, willing and able to work. *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Medhaug*, 578 F.3d at 817.

While Agan does have an extensive work history of approximately thirty years, the record also indicates he continued to work and hold himself out as able to work after his alleged onset date of July 22, 2008. AR 186-87. At the hearing, Agan told the ALJ that his most recent job was with Wal-Mart in 2009. AR 33. He said that he worked there part-time for a month and quit because of his back pain. *Id*. Agan also returned to working full-time as a welder in November 2008 after his third back surgery. AR 257, 271. A report from the National Directory of New Hires[4]

---

[4] The NDNH is a national database of wage and employment information maintained by the Federal Office of Child Support Enforcement. It includes information as to new hires, quarterly wages, and unemployment benefits. The Commissioner has authority to request this information under 42 U.S.C.

("NDNH") indicates that Agan last received wages from his welding job in the fourth quarter of 2008 and began collecting unemployment benefits at that time. AR 183-84. The NDNH report also indicates Agan continued receiving unemployment benefits until he was hired by Wal-Mart in May 2010.[5] AR 188-90. While Agan's jobs after his alleged onset date may not have risen to the level of substantial gainful activity, the ALJ did not err by discounting Agan's credibility based on jobs Agan held after his onset date instead of crediting Agan's allegations based on his extensive work history. *See Medhaug*, 587 F.3d at 816 (holding the ALJ properly considered the claimant's employment positions maintained after the alleged onset date in helping determine the claimant's credibility).

The ALJ's credibility determination based on Agan's daily activities, the lack of objective evidence supporting his limitations or disabling impairment, his limited treatment or complaints after his onset date, and other inconsistencies in the record is supported by substantial evidence.

## B. Development of the Record

Agan argues the ALJ erred by failing to develop the record in two separate areas necessary to making a proper disability determination. First, he alleges the ALJ did not obtain work-related limitations from a treating or examining source. Second, he argues the ALJ should have developed the record more concerning the limitations of Agan's diabetic peripheral neuropathy. Finally, he argues the ALJ should have requested Agan's mental health records or ordered a consultative examination to properly determine whether Agan's mental impairments were disabling. The Commissioner responds that there was enough medical evidence in the record to support the ALJ's

§ 653(j)(4). *See* U.S. Dept. of Health and Human Servs., Admin. for Children and Families, *A Guide to the National Directory of New Hires*, located at http://www.acf.hhs.gov/programs/cse/newhire /library/ndnh/background_guide.htm.

[5] Agan appears to have erred when he testified that he worked for Wal-Mart in 2009.

RFC finding without having to seek specific work-related limitations from treating or examining sources and that further development of Agan's diabetic peripheral neuropathy and mental impairments was not required because substantial evidence supported the ALJ's finding that these impairments were not severe.

An ALJ has a duty to develop the record fully and fairly, independent of the claimant's burden to press her case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). A social security hearing is a non-adversarial proceeding, and the ALJ must develop the record so that "deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994).

### 1. Work-Related Limitations from a Treating or Examining Source

The ALJ must determine a claimant's RFC based on all the evidence including "medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803. An ALJ may need to order medical examinations and tests when the medical evidence in the record is insufficient to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994).

In arguing the ALJ erred by failing to obtain work-related limitations from a treating or examining source, Agan cites *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The claimant in *Nevland* was unable to do past relevant work. *Id.* at 858. In determining the claimant's RFC to do other kinds of work, the ALJ relied solely on the opinions of non-treating, non-examining physicians who reviewed the reports of treating physicians when assessing the claimant's ability to function in the workplace. *Id.* The court reversed and remanded the case because there was no *medical* evidence about how the claimant's impairments affected his ability to function at the time. *Id.*

Here, the ALJ considered medical evidence shortly after his back surgery, which indicated Agan's gait was coordinated and smooth. He was able to squat and regain a standing position without difficulty and was able to touch his knees while flexing forward. In addition, he had full and nontender range of motion in his upper and lower extremities with no evidence of instability. Agan completed physical therapy three times a week for two weeks followed by work hardening for two weeks. AR 279-80. Agan returned to work part-time in October 2008 with the physician assistant suggesting a limitation of no more than 30 pounds lifting and limited bending and twisting. AR 275-76. Agan was back to working full-time as a welder in November 2008 with no limitations noted. AR 271-72.

No functional limitations were placed on Agan outside the 30-pound lifting limit following his surgery. Agan's only complaints of back pain after his surgery were related to medication refills or injuries that exacerbated his back pain. AR 380, 386, 389, 433. Most examinations only noted tenderness of the spine. AR 380-81, 389, 459. After his back surgery, Agan primarily sought treatment for unrelated medical issues including chest pain and a hand injury. AR 476-80, 485.

The ALJ's RFC assessment is supported by substantial evidence in the record, including medical evidence. Agan was working full-time in November 2008, despite complaints that his back pain was constantly at a 7 out of 10. AR 271. Physical examinations following his surgery indicated that he had normal functioning of his extremities. AR 271, 275, 279. These medical evaluations are enough for the ALJ to determine Agan's limitations in the workplace. *See Cox v. Astrue*, 495 F.3d 614, 620 n.6 (8th Cir. 2007) (the lack of an explicit reference to "work" in proximity to a description of medically-evaluated limitations does not make it impossible for the ALJ to ascertain work-related limitations from the evaluation).

The ALJ's RFC also has significantly more limitations than the 30-pound lifting limit imposed when he was released to return to work following his surgery. This reflects a consideration of Agan's subjective allegations and the medical evidence

supporting degenerative disc disease. No functional limitations were placed on Agan after October 2008 and nothing in the record suggests his condition later worsened. In fact, the medical records reveal that he primarily had tenderness over his spine and only complained of pain when he needed refills on his medication. This constitutes substantial evidence, including some medical evidence, which addresses Agan's ability to function in the workplace and supports the ALJ's RFC determination. No further development of the record was necessary for the ALJ to reach this conclusion.

### 2. Diabetic Peripheral Neuropathy

Agan also argues the ALJ failed to develop the record with respect to his diabetic peripheral neuropathy. He references a treatment note before his surgery in which the doctor opined that bilateral lower extremity numbness and tingling was 25% of his problem, although Agan admits that it is not clear how much the numbness and tingling (if any) can be attributed to Agan's peripheral neuropathy. AR 283. Agan contends this aspect of the record should have been more fully developed by the ALJ.

The Commissioner points out that in the same treatment note the doctor also stated that back pain was 75% of the problem. AR 283. The Commissioner argues the ALJ did not need to develop this issue any further based on this record which indicates Agan's impairment from diabetes was non-severe.

In evaluating Agan's diabetes mellitus as an impairment, the ALJ stated, "After receiving medication and diabetic counseling, his symptoms appeared to be stable and do not have more than a minimal effect on his ability to perform basic work activities." AR 16-17. He therefore found it to be a non-severe impairment.

An ALJ may order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled. *Barrett,* 38 F.3d at 1023 (citation omitted). A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or

mental ability to do basic work activities.' " *Pelkey v. Barnhart,* 433 F.3d 575, 577 (8th Cir.2006) (quoting 20 C.F.R. § 404.1520(c)).

The ALJ adequately developed the record concerning Agan's diabetes mellitus and diabetic peripheral neuropathy. Agan's sensory deficits that were consistent with diabetic peripheral neuropathy were described as "mild". AR 400. Agan took medication for his peripheral neuropathy and it was never the focus of any treatment after surgery. There is no evidence that he had significant physical limitations as a result of peripheral neuropathy. The record contains substantial evidence supporting the ALJ's conclusion that Agan's diabetic peripheral neuropathy was a non-severe impairment and it did not require further development by the ALJ.

### 3. Evidence of Mental Impairments

Agan also argues the ALJ failed to fully and fairly develop the record because he did not obtain Agan's mental health records from the five months prior to the administrative hearing and did not order a consultative evaluation to help determine whether Agan's mental impairments were severe. The Commissioner responds that substantial evidence supports the ALJ's determination that Agan's mental impairments were non-severe and additional evidence was not needed to develop this issue further.

"Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment." *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011). In determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitations: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). If the degree of limitation in the first three functional areas is "none"

or "mild" and there are no episodes of decompensation, then the ALJ should conclude that it is a non-severe impairment unless the evidence indicates otherwise. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). A "severe" impairment is one that significantly limits the claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1521, 404.1529.

"[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson*, 51 F.3d at 779 (quoting *Naber*, 22 F.3d at 189). Although an ALJ must fully and fairly develop the record, he "is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001).

In evaluating Agan's mental impairments, the ALJ acknowledged that Agan suffered from chronic alcoholism, depression, and anxiety, although none of these were alleged in Agan's disability application. AR 16, 195. The ALJ noted that Agan admitted to drinking twelve beers per day in March 2010. AR 16. He also noted that Agan intentionally overdosed on Tramadol (in October 2009) and benzodiazepines (in June 2010) but was stabilized and released home on both occasions. *Id.* In finding Agan's mental impairments were non-severe, the ALJ reasoned:

> The record reflects minimal treatment for mental health conditions and the brief hospitalizations appear to be isolated events. The claimant's physical conditions appeared to be the focus of treatment notes, with only sporadic mention that the claimant received medication for depression. There are no treatment notes that indicate a mental health specialist has placed any type of limitations on the claimant due to mental health conditions.

*Id.*

During the hearing, Agan stated he had been seen at Berryhill for the past five months for treatment of his anxiety and depression. The ALJ inquired about the treatment he was receiving there and Agan indicated he was prescribed medication. AR 42-43. He said it helped with his anxiety and depression, but he still had symptoms. *Id*. Agan argues the ALJ should have requested the treatment records from Berryhill, and explains they were not provided by the attorney because "there is nothing in the record demonstrating the claimant's attorney at [the] hearing was aware the records were missing." Pl.'s Br. at 20.

Outside of the ALJ's duty to fairly and fully develop the record, the claimant has the initial burden of producing evidence. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled."). The ALJ can help the claimant obtain medical records, but only with the claimant's permission. *See* 20 C.F.R. § 404.1512(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). The Notice of Hearing sent to a claimant's attorney before a hearing emphasizes the importance of reviewing the file for completeness and offers various methods for the attorney to review the file prior to the hearing. AR 108. The fact that Agan's attorney did not submit additional medical records does not mean the ALJ breached his duty to fully and fairly develop the record. The ALJ is required to obtain additional evidence "only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010).

The record concerning Agan's mental impairments was sufficient for the ALJ to determine that these impairments were non-severe without asking for additional evidence or a consultative examination. First, Agan failed to allege mental impairments in his application for benefits. AR 195. In an appeals report, Agan listed depression as

a new mental limitation which began in July 2009, but stated that no changes had occurred in his daily activities since his last disability report in May 2009. AR 229.

Second, depression was not the focus of any treatment evidenced in the medical records. Instead, depression is mentioned only with regard to medication, and is not the subject of any treatment notes, outside of Agan's two suicide attempts. In July 2009, when Agan alleged depression as a new mental impairment, he saw the nurse practitioner for diarrhea, not depression. AR 385. However, during that appointment Agan explained he was under stress and feeling depressed because his unemployment was about to run out and he had applied for social security disability. *Id.* She prescribed an anti-depressant and two months later assessed his depression as stable. AR 381.

Third, Agan's suicide attempts did not change the way he was treated for depression. In October 2009, Agan intentionally overdosed on his medication. AR 402. He was released the next morning, denied any suicidal thoughts, and his medication remained the same. AR 402, 432. Agan was referred to Plains Area Mental Health, but there are no notes in the record from any visits there. AR 379. On June 8, 2010, Agan reported to UCHC, requesting detoxification for alcohol and Valium. AR 465. At that appointment, the doctor indicated that Agan may have been under the effect of a benzodiazepine overdose based on the signs he was exhibiting. He had the police escort Agan to the hospital when Agan attempted to leave against the doctor's advice. AR 465, 482. The doctor contacted Agan's counselor at Compass Pointe in Spencer who stated Agan did not stick to the program when he was enrolled. AR 465. Agan was released from the hospital on June 23. AR 482. There are no records from this hospitalization, but he was discharged on his usual medication, excluding Valium, and with instructions to call the doctor if he had problems with his nerves again. *Id.*

Finally, Agan's depression and anxiety appear to be controlled primarily through medication and are not identified as the cause of Agan's limitations. During the

administrative hearing, Agan stated he had been prescribed a new anti-depressant from Berryhill. AR 42. He said the medication helped, although he still experienced symptoms. *Id.* This is consistent with other evidence in the record that Agan's depression and anxiety were primarily controlled through medication. When asked why he was not working, Agan attributed it to his chronic back pain. AR 35. Agan also indicated during the hearing that he started suffering from anxiety and depression when he lost his job in 2008 and did not experience anxiety and depression while he was working.

The ALJ adequately developed the record concerning Agan's mental impairments. Although Agan now points out that additional evidence was available, it was not necessary for the ALJ to obtain these records or order a consultative examination because substantial evidence in the record already indicated that Agan's mental impairments caused no more than mild limitations. Additionally, testimony about Agan's recent treatment did not indicate more severe limitations due to depression and anxiety. Agan has failed to identity any prejudice resulting from the ALJ's failure to consider additional records. The ALJ's conclusion that Agan's mental impairments were non-severe is substantially supported by the record and did not require further development.

## *Recommendation*

For the reasons discussed above, the court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision be **affirmed** and judgment be entered in favor of the Commissioner and against Agan. Objections to the Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 15th day of October, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA