**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

GARY A. AGAN,

              Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

No. C 11-3061-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING REPORT AND
RECOMMENDATION**

---

**TABLE OF CONTENTS**

I.     **INTRODUCTION**..................................................................... 2
    A.    *Procedural Background* ........................................... 2
    B.    *Factual Background* ................................................ 4
        1.    *Summary of medical evidence* ........................... 4
        2.    *Hearing testimony*......................................... 16
        3.    *Summary of the ALJ's decision* ...................... 19

II.    **ANALYSIS** ........................................................................ 22
    A.    *Standard Of Review* .............................................. 22
    B.    *Agan's Objections* ................................................ 28
        1.    *The ALJ's credibility determination* ................... 29
            a.    *Lack of functional restrictions* ................ 30
            b.    *Objective medical evidence and daily activities*............ 31
            c.    *Subjective nature of back pain* ............... 34
            d.    *Loss of health insurance* ...................... 35
            e.    *Work history* ....................................... 36
            f.    *Age category* ...................................... 38
        2.    *The ALJ's development of the record* ................. 39
            a.    *Work-related limitations* ........................ 39
            b.    *Agan's diabetic peripheral neuropathy* ...................... 41
            c.    *Evidence of mental impairments* ............................. 42

III.   **CONCLUSION** ................................................................... 44

## I.    INTRODUCTION

### A.    Procedural Background

This case is before me on a Report And Recommendation (docket no. 10) from United States Magistrate Judge Leonard Strand, regarding plaintiff Gary A. Agan's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"), pursuant to Titles II and XVI of the Social Security Act.

I quote from Judge Strand's Report And Recommendation to introduce the procedural background of this case:

> Agan was born in 1960, has a high school education, and previously worked as a welder, assembler, mechanic and sheet metal installer. AR 32–34, 161, 215–24, 262. On April 22, 2009, Agan applied for DIB and SSI, alleging disability beginning on July 22, 2008 due to a back injury, diabetes, a foot injury and gout. AR 161, 191, 195. The Commissioner denied Agan's applications initially and again on reconsideration. AR 58–61. Agan requested a hearing before an Administrative Law Judge ("ALJ"). AR 74. On April 25, 2011, ALJ Jeffrey Marvel held a hearing at which Agan and a vocational expert ("VE") testified. AR 28–57. On May 25, 2011, the ALJ issued a decision finding Agan not disabled since the alleged onset date of disability of July 22, 2008. AR 10–27. Agan sought review of this decision by the Appeals Council, which denied review on September 7, 2011. AR 1–6. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

Report And Recommendation at 1–2 (docket no. 10).

On November 10, 2011, Agan filed a complaint with this court, seeking review of the ALJ's decision. The case was referred to Judge Strand, pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. On

March 14, 2012, Agan filed his brief in support of benefits (docket no. 7). First, Agan argued that the ALJ failed to properly evaluate his allegations under *Polaski v. Heckler*, contending that the objective evidence provides more than sufficient support to Agan's testimony. Second, Agan contended that the ALJ failed to fully and fairly develop the record. Specifically, Agan argued that the ALJ failed to obtain work-related limitations from an examining source. Also, Agan contended that the ALJ failed to obtain Agan's mental health records or to order a consultative evaluation. Third, Agan argued that the ALJ's errors are not harmless.

On May 14, 2012, the Commissioner responded with his brief in resistance (docket no. 8). The Commissioner contends that the ALJ was not required to develop the record any further because substantial evidence supports his finding that Agan's mental impairments and diabetes were not severe. The Commissioner argues that the ALJ articulated valid reasons for discounting Agan's credibility. The Commissioner contends that the ALJ's RFC determination was supported by substantial evidence on the record as a whole. Also, the Commissioner maintains that the ALJ's hypothetical question was proper and the vocational expert's testimony provided substantial evidence that Agan was not disabled.

Judge Strand issued a Report And Recommendation on October 15, 2012 (docket no. 10). Judge Strand determined that the ALJ's decision was supported by substantial evidence in the record as a whole, and, therefore, recommended that the ALJ's decision denying benefits be affirmed. Specifically, Judge Strand found that the ALJ's credibility determination based on Agan's daily activities, the lack of objective medical evidence, the limited treatment or complaints after his onset date, and the inconsistencies in the record is supported by substantial evidence. Responding to Agan's argument that the evidence could be viewed to support a finding of disability, Judge Strand concluded that the argument reflects the wrong standard of review and the

ALJ's decision must be given deference. Judge Strand determined that the ALJ adequately developed the record regarding the evidence supporting the RFC assessment, medical evaluations indicating Agan's diabetes mellitus and diabetic peripheral neuropathy, and Agan's mental impairments. On October 29, 2012, Agan filed a timely objection (docket no. 11) to Judge Strand's Report And Recommendation.

### B.    Factual Background

In his Report And Recommendation, Judge Strand made the following findings of fact:

#### 1.    Summary of medical evidence

#### A. Dr. Mark Palit

Beginning in February 2005, Agan went to see Dr. Palit for low back and right leg pain that had lasted for three months. AR 496. Agan explained that the pain extended all the way down to his foot and was aggravated by increased activity. *Id.* He described the pain as sharp and shooting and chiropractic care provided minimal relief. *Id.* Dr. Palit ordered x-rays of Agan's spine which showed decreased disc height, mildly, at L5-S1. *Id.* Upon physical examination, the doctor noted that Agan walked slowly but steadily, favoring the right leg. *Id.* He found that Agan's range of motion of the lumbar spine was reduced on flexion and extension and the straight leg raise was positive on the right. *Id.* Palpation of the lower lumbar spine produced mild discomfort. *Id.* Agan was diagnosed with lumbar radiculopathy and prescribed a pain reliever. *Id.* An MRI scan was also scheduled.

At a follow-up two days later, Dr. Palit found that the MRI revealed lateral recess stenosis at L4-L5. AR 494. He recommended an epidural steroid injection and referred Agan to the Pain Center. *Id.* Agan was released to light duty work. *Id.*

In March 2005, Agan reported that he was doing about "30–40% better" after his injection. AR 494. After a second injection, he claimed that he experienced no relief and he continued to have ongoing pain described as sharp and shooting, which was aggravated by increased activity. AR 493. Dr. Palit recommended L4-5 decompression surgery, which was performed on April 22, 2005. AR 492–93.

After the lumbar decompression, Agan reported on May 5 that his right leg pain had been resolved, but now he experienced left leg pain down to his foot with a burning sensation. AR 492. Dr. Palit instructed Agan to continue walking, progressing from a walker to a cane. *Id.* He prescribed Amitriptyline and Ibuprofen. *Id.*

Agan returned for a follow-up in June 2005. Because he still complained of left leg pain, the doctor ordered another MRI with a contrast agent. AR 491. This MRI revealed mild residual stenosis at L4-5 with a very mild disc bulge. *Id.* Dr. Palit referred Agan to another doctor for a left L4 selective nerve root block. *Id.* After that injection, Agan reported minimal pain. AR 489. His work duties were advanced to 5.5 hours per day. *Id.* In July 2005, Agan reported he was doing well and returned to regular work duty. AR 489.

### B. Dr. Mohamed K. Youssef

On January 3, 2007, Agan began seeing Dr. Mohamed Youssef, at Trinity Regional Medical Center in Fort Dodge, Iowa for back pain that radiated down both legs. AR 353. He was given an epidural steroid injection at L5-S1. AR 352. The treatment notes indicate Agan had a previous epidural steroid injection in October 2006 and experienced good pain relief. *Id.* Agan returned for another injection on April 20, 2007. AR 349–51. During this visit the nurse prepared a report asking Agan to identify how much his chronic pain limited his ability to perform certain activities. AR 351. Agan listed the following activities as

limited a lot: climbing stairs, kneeling or bending, getting out of the house, and pursuing hobbies or other recreational activities. He also claimed to get 50 percent less sleep than usual due to his pain. *Id*. AR 489.

On April 29, 2007, Agan reported to the emergency room at Pocahontas Community Hospital with symptoms of increased thirst, increased urination during the night, and dizziness. AR 427–29. The nurse noted that he was a newly diagnosed diabetic and his glucose was elevated. *Id*. Agan was admitted to acute care. He was given diabetic education and started on insulin. *Id*. He returned to half-days at work on May 8 and full-time on May 22. AR 451.

Agan received additional lumbar epidural steroid injections from Dr. Youssef. On July 25, 2007, he still complained of continued low back pain radiating down both legs. AR 347. He reported that climbing stairs, getting in or out of bed or a chair, and pursuing hobbies or other recreational activities were limited a lot by his pain and he was getting 50 percent less sleep than usual. AR 348. He was given epidural steroid injections on that date and again on October 5, 2007. AR 342–45. Dr. Youssef noted Agan had experienced excellent pain relief from this procedure in the past. AR 342.

On November 28, 2007, Agan agreed to a spinal cord stimulator trial. AR 337–38. At this visit, he told the nurse that activities such as working with his hands, performing tasks at work, and visiting with family and friends were also now limited a lot by his pain in addition to the activities previously identified. AR 341. After the spinal cord stimulation lead was inserted, Agan reported a numbing, tingling sensation covering the area of pain and was very satisfied with the current stimulation. AR 337.

At a follow-up on December 3, 2007, Agan reported excellent pain relief from the spinal cord stimulator trial, with about an 80 percent decrease in pain. AR 330. Agan explained that he was more active throughout the trial and

able to sleep through the night without waking up. *Id.* Dr. Youssef's impression was that Agan's pain had been secondary to lumbar degenerative disc disease, a herniated lumbar disc, and lumbar radiculopathy. *Id.*

### C. Dr. Cassim Igram

Dr. Youssef recommended that Agan see Dr. Igram at the Iowa Ortho Center regarding his chronic lumbar radiculopathy. AR 264–65. Agan reported that nothing had adequately addressed his pain except the recent spinal cord stimulator trial and he was interested in pursuing a permanent implant. AR 264. He stated that daily activity made his pain worse. *Id.* Upon physical examination, Dr. Igram noted that flexion and extension were limited and Agan had some stiffness with these maneuvers. *Id.* Agan also had breakaway weakness to motor testing in both lower extremities with sensory deficit in a non-dermatomal pattern in the right lower extremity. *Id.*

On December 24, 2007, Dr. Igram performed a thoracic laminectomy for placement of a permanent spinal stimulator. AR 266. Agan was instructed to have the stimulator programmed by doctors in Fort Dodge and he was released to return to work on January 4, 2008. AR 269.

On January 11, 2008, Agan returned to Trinity Regional Medical Center in Fort Dodge reporting pain in his low back and right leg. AR 327. He claimed he was not getting adequate coverage in his lower back from the spinal cord stimulator. *Id.* Agan was referred back to Dr. Youssef in the Pain Clinic to reprogram the stimulator. *Id.* After attempting several different programs that did not provide coverage to the painful area in Agan's back, Dr. Youssef concluded that Agan needed to see Dr. Igram again to discuss repositioning the stimulator. AR 323–24.

### D. Dr. Russell Buchanan

On March 27, 2008, Dr. Buchanan began evaluating Agan at the Iowa Spine and Brian Institute. AR 291–92. Agan reported constant pain in his low back that was improved with lying down. He claimed the pain was worse when sitting for a prolonged period. *Id.* Dr. Buchanan noted that Agan had some difficulty walking on heels and toes due to bilateral lower extremity pain. He also had difficulty squatting to regain standing and flexing forward to touch his knees to regain standing. *Id.* Agan was working as a welder at this time. *Id.* Dr. Buchanan ordered a CT scan. *Id.*

Dr. Buchanan reviewed the CT scan results with Agan in mid-April. He found that the scan demonstrated facet degeneration at L4-L5 that was "quite severe" and that could be the possible generator of pain. AR 287. He ordered discography to determine whether Agan's dorsal column stimulator leads needed to be re-positioned. *Id.*

Dr. Robert Federhofer performed the discography and stated it was his impression that Agan had "definite diskogenic pain at the L5-S1 level and probable diskogenic pain at the 4-5 lumbar level." AR 312.

Dr. Buchanan saw Agan again on June 26, 2008. AR 283–84. He noted that Agan had difficulty achieving a standing posture and when he did, he had a flex posture at the waist. He noted that Agan could not straighten up without significant low back pain. Although Agan was able to walk on his heels and toes, he had difficulty squatting to regain standing and flexing forward to touch his knees. *Id.* Based on the findings of the discography study and the morphology of disks, Dr. Buchanan suggested surgery. *Id.*

On July 22, 2008, Dr. Buchanan performed a lumbar interbody fusion at L4-L5 and L5-S1 with interbody cage placement and anterior plating. AR 306–09. The spinal cord stimulator was also removed. AR 307. During the surgery Dr. Buchanan found severe disc degeneration at L5-

S1 with significant disc collapse and loss of integrity of the structure of the disc as well as the cartilaginous endplate. AR 306. He noted the L4-5 disc appeared hardier and somewhat healthier with the exception of a central area of the disc that demonstrated severe deterioration. AR 306.

Agan reported to Trimark Pocahontas Family Practice on August 6, 2008, to have suture removal from his back surgery. He also saw a physician for gout in his left foot and arthritis in his right ankle. At that time, he also indicated that he stopped taking Avandia for his diabetes because of the cost. AR 443.

On September 8, 2008, Agan reported for a follow-up exam at the Iowa Spine and Brain Institute. He stated he was doing very well in terms of pain control and was not experiencing any of the leg pain he had before the surgery. AR 279. He indicated that he still wore a bone stimulator on a daily basis and the physician assistant encouraged him to continue this. AR 280. Agan inquired about when he could return to work. *Id.* The physician assistant recommended physical therapy three times per week for two weeks followed by work hardening for two weeks at which time they could evaluate whether he was ready to return to work. *Id.*

A month later, Agan stated that physical therapy had helped and that he was doing better apart from some occasional stiffness. AR 275. He stated he did not have any pain in his legs. *Id.* His gait was coordinated and smooth and he was able to walk on his heels and toes. He could squat and regain a standing position without difficulty and could touch his knees while flexing forward. *Id.* Agan was released to work 4.5-hour days with no lifting over 30 pounds and limited bending and twisting. *Id.*

Agan reported to the emergency room at Pocahontas Community Hospital on October 19, 2008, stating he had tripped and fell, exacerbating his chronic low back pain. AR 400. Agan stated the pain was so severe he had

difficulty getting back to his chair. *Id.* Agan was out of pain medication at this time. After a physical examination, the physician noted Agan's motor skills and reflexes of the lower extremities were normal. The physician also noticed some mild sensory deficits consistent with diabetic peripheral neuropathy. *Id.* Agan was given a pain reliever and a note off work the next day. *Id.*

Agan was back to working full-time in November 2008. At a follow-up exam, he stated he was still experiencing constant back pain of 7 out of 10, but no pain in his legs. AR 271. He said he was doing exercises at home, walking, and was continuing to wear the bone stimulator. *Id.* The physician assistant suggested another injection in an effort to relieve some of the pain near Agan's right SI joint. AR 272.

Dr. Youssef administered the bilateral sacroiliac injection on November 14, 2008. AR 315. The nurse's notes indicate that Agan had been laid off for missing work. AR 317. Agan described his pain level as 6 out of 10 and said his pain kept him from doing activities such as climbing stairs, performing housework, and pursuing hobbies or other recreational activities. AR 318. Other activities that were limited due to his pain included walking, kneeling or bending, bathing or dressing himself, getting in or out of bed or a chair, preparing meals, visiting with family or friends, and getting out of the house. AR 318.

### E. United Community Health Center

On February 10, 2009, Agan sought treatment at United Community Health Center ("UCHC") in Storm Lake, Iowa for back pain and other health issues. AR 390. On March 12, 2009, Agan went to UCHC and complained of back pain. He was prescribed Tramadol.[1] AR 389. He

---

[1] Tramadol is prescribed for the "management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." *Physician's Desk Reference* 2694 (64th ed. 2010).

was seen again on April 21, 2009, and prescribed Diazepam.[2] AR 388. On June 25, Agan returned complaining of chronic back pain and diarrhea. AR 386. He had run out of Tramadol a week earlier and was taking an extra dose of Diazepam each day. Id. Both prescriptions were re-filled at this appointment. *Id.* The nurse practitioner noted that he ambulated slowly and had difficulty getting up and down from the examination table. *Id.*

On July 14, Agan reported that he continued to have diarrhea and abdominal pain. AR 385. The nurse practitioner noted that Agan was under stress as his unemployment was about to run out. She also noted he was depressed and that he had applied for disability benefits. *Id.* She prescribed an anti-depressant. Agan missed a scheduled appointment at the beginning of August, but on August 28 he reported to the clinic with chest discomfort. AR 383. He explained that he had been doing yard work the week before and developed pain in his left lower chest wall. *Id.* The nurse practitioner assessed it as muscle strain and prescribed an anti-inflammatory. *Id.* On September 9, Agan saw the nurse practitioner for refills of his pain medications. She examined Agan finding tenderness around his spine and refilled his medications. She also noted Agan's depression was stable. AR 381.

On September 28, Agan visited Trimark Pocahontas Family Practice and reported a sudden onset of low back pain radiating down his right leg after lifting a chair. AR 433–34. The doctor assessed Agan with lumbar strain and prescribed a muscle relaxant. Days later, Agan reported to UCHC with the same complaint from the same incident. AR 380. He was prescribed a narcotic pain reliever. *Id.*

---

[2] Diazepam is used to treat mild to moderate anxiety, some types of seizures, muscle spasms, nervous tension, and symptoms related to alcohol withdrawal. It is in the class of drugs known as benzodiazepines and is commonly sold under the brand name Valium. MARK MITCHELL ET AL., THE GALE ENCYCLOPEDIA OF MENTAL HEALTH 489 (Kristin Key, ed., 3rd ed. 2012).

On October 6, Agan was taken to the emergency room after attempting suicide. He had taken 10 to 15 Tramadol pills and left a note for his wife. AR 374, 379, 402–03. The doctor noted Agan said it was due to "some bad news he received," but he then "blamed it on his wife and arguments about cooking and various other items." AR 402. He was discharged the next morning with the recommendation to seek counseling. AR 402. His provider at UCHC suggested he immediately begin counseling at Plains Area Mental Health Center.[3] AR 379.

Agan returned to UCHC on November 24 requesting refills of his back pain medication, which were ordered. AR 461. He had a follow-up appointment in December with no new complaints. AR 460. On January 13, 2010, Agan requested refills of his back pain medication again, and they were ordered. AR 459. On February 18, he had a follow-up appointment and stated he felt good. AR 457.

In March, he sought a consultation at UCHC for alcohol abuse. AR 470. Agan told the nurse practitioner he drank alcohol every day for the entire day, estimating he drank at least a 12-pack of beer per day. *Id.* He claimed that he did not have any alcohol that day, although the nurse noted that he spoke loudly and slurred his speech. *Id.* Agan stated that he had tried to get into an inpatient detoxification center at Fort Dodge, but had to wait two weeks. *Id.*

On April 6, Agan returned to UCHC for sinus congestion, but also mentioned that he was experiencing back pain. He was prescribed Darvocet, a narcotic pain reliever for his back. AR 469.

On April 21, 2010, Agan reported to UCHC stating that he had tried inpatient alcohol treatment in Fort Dodge, but it had not gone well. AR 468. He also stated he had been seeing a counselor at Compass Pointe in Spencer,

---

[3] It is unclear whether Agan attended counseling at Plains [Area] Mental Health Center. No treatment notes appear in the record.

Iowa. Agan told the nurse practitioner he had lost the medications for his back pain and requested more Darvocet. *Id.* The nurse practitioner offered to call the treatment center, but Agan said he had already contacted the facility. *Id.* They agreed that Agan should not take any more narcotics and the nurse practitioner prescribed an anti-inflammatory instead. *Id.* Agan was educated on the consequences of drug seeking. *Id.*

On May 18, Agan reported to UCHC for a follow-up on his diabetes and a lipid panel. AR 467. The nurse practitioner noted that she educated Agan on his diet and suggested exercise of 30 minutes maximum, five days per week.

On June 8, Agan requested detoxification from alcohol and valium. AR 465. At the time of the visit, the doctor thought Agan had overdosed on benzodiazepines. *Id.* The police were contacted to take Agan to the hospital after he insisted on driving by himself. *Id.*

In August 2010, Agan was referred to the Iowa Heart Center for chest discomfort which had lasted for two weeks. AR 472. Outside of reflux disease, there were no abnormal findings. AR 475.

### F. Orthopaedic & Sports Medicine Specialists, LLC

In December 2010, Agan began seeing Kristina Johnson, PA-C, for a right hand injury. AR 488. He injured his hand after hitting a wall with a closed fist. *Id.* He had visited the ER immediately after the injury, where he was x-rayed and his hand placed in a splint. *Id.* He told Ms. Johnson that it was causing him pain and he was experiencing numbness and tingling. *Id.* Upon physical examination, she found bruising, swelling, and tenderness. *Id.* She also noted that Agan was able to flex and extend his wrist very minimally due to the swelling and pain. *Id.* She instructed him to start utilizing his hand and doing hand pumps to bring down the swelling. *Id.*

Upon follow-up for his hand, no changes were noted but Agan still complained of pain. AR 487. He was prescribed hydrocodone. *Id.* The physician assistant noted that he had significant decreased range of motion with his fingers and wrist and started him on occupational therapy to improve this. AR 486. Agan stated that he was still experiencing pain. *Id.*

Agan met with a surgeon on January 18, 2011 for evaluation of his right hand. AR 485. Upon physical examination, the doctor noted there was some bruising and he had tenderness in the mid shaft of the middle finger. *Id.* Flexing and extending certain areas of the hand were also limited. *Id.* The doctor ordered tests and prescribed a pain reliever with the instruction that this was the last time his office would be giving him any pain medication. *Id.*

In February, the doctor noted that Agan's hand was unchanged since his last visit. AR 502. Agan still complained of discomfort, but the doctor noted, "I am at a loss to find an appropriate diagnosis for his pain and discomfort." *Id.* Agan was referred to another hand surgeon for further evaluation and given a final prescription of a pain reliever. *Id.*

### G. State Agency Medical Consultants

On June 12, 2009, Laura Griffith, D.O., performed a physical RFC assessment. AR 35–62. After reviewing Agan's medical records, she concluded he could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. AR 356. She also thought Agan could sit, stand and/or walk six hours out of an eight-hour workday. *Id.* She estimated that Agan could occasionally climb a ramp or stairs and occasionally perform tasks that required balancing, stooping, kneeling, crouching, or crawling. AR 357. She indicated that he could never be expected to climb a ladder, rope, or scaffolds. *Id.*

In explaining her findings, Dr. Griffith noted that Agan's treating sources indicated he had normal muscle tone

and strength. AR 360. While Agan reported that he had constant back pain, she found his credibility somewhat eroded by his failure to seek further care since November 2008. *Id.* She noted that two months after his fusion surgery, he reported that he was doing very well in terms of pain control and the pain he had in his legs was normal. AR 362. She also noted that a physical exam at that time showed Agan had full range of motion in his extremities with normal muscle strength and tone, with physical therapy and work hardening suggested. *Id.* In addition, in November 2008, a month after Agan had been released back to work part-time with a 30-pound lifting restriction, he reported that he had been working full-time but still experienced ongoing back pain. *Id.*

Dr. Griffith also commented on Agan's daily activities. She noted that he takes one-mile walks and lays on the couch. He has no difficulty with personal care, does laundry, and mows the yard. He reported that he could lift 20 pounds. *Id.*

This physical RFC assessment was submitted to Gary Cromer, M.D., on October 1, 2009 for reconsideration. AR 368. Additional allegations of worsening pain, depression, and chronic diarrhea were considered. *Id.* Dr. Cromer noted that new medical evidence included an abdominal ultrasound obtained for hepatomegaly and abdominal pain. *Id.* This test showed only mild hepatomegaly with probable fatty infiltration, and a small right renal cyst. *Id.* An updated report on Agan's activities of daily living and a pain questionnaire were requested, but were never returned. *Id.* Dr. Cromer concluded, "Evidence fails to document substantial worsening in physical condition warranting alteration in the initial assessment. No opinion evidence is noted. The initial assessment, supplemented by this update, remains appropriate and is therefore affirmed." *Id.*

## 2. Hearing testimony

### A. Plaintiff's Testimony

At the administrative hearing, Agan testified he was 50 years old, graduated from high school and had vocational training in auto mechanics from Lincoln Technical Institute. AR 32. He stated he last worked part-time for Wal-Mart in 2009. He worked in the store's tire and lube center four or five hours a day and four or five days per week. AR 33. He held this job for a month, but quit because he could not handle the pain in his back. *Id.* Agan also testified that he previously worked as a welder for seven or eight years and as a sheet metal installer. AR 33–34. He testified that as a sheet metal installer he carried a tool belt weighing 25 to 30 pounds and would frequently lift objects weighing from 10 to 30 pounds. AR 34.

Agan testified that he was no longer working because of chronic low back pain. *Id.* He explained that the pain radiates mainly down his right leg, is constantly present, and increases with movement. AR 36. He estimated that the baseline level of pain is about a seven on a scale of ten. He was seeing a family practitioner for pain management and was treated through medication, but not physical therapy. AR 44. Agan testified that he had three surgeries on his back. AR 36. The first one was a laminectomy in 2005, after which he was able to return to work. *Id.* The second surgery was in 2007, when a neurostimulator was placed in his back. AR 36–37. Agan was also able to return to work after this surgery. AR 37. The third surgery was in 2008 when the stimulator was removed. AR 37. Agan returned to work after this surgery, but stated his employer sent him home after determining he was not performing his job. *Id*. Agan testified that when he tried to return about two weeks later, he was told not to come back. *Id*.

Agan also discussed his other medical problems and the medications he was taking for them. He was taking hydrocodone and Tramadol for his back pain but testified that neither helped much with his pain. AR 38–39. Agan also stated that he treated his diabetes with insulin and that

his blood sugar had been high recently with some of the medication he was taking. AR 40. Doctors had told him blood sugar goes up with pain. *Id.* For gout, Agan said he took Allopurinol. *Id.* He informed the ALJ that the problem with his hand was now being attributed to gout in his fingers. *Id.*

Agan's alcoholism and suicide attempts were also discussed. Agan testified that he had stopped drinking alcohol six months earlier and had completed a treatment program. AR 40–41. He admitted that he had overdosed on Valium in June 2010, which had been prescribed for anxiety. AR 41–42. Agan stated that he was still suffering from anxiety and had begun treatment at the Berryhill Center for Mental Health ("Berryhill") for both anxiety and depression five months earlier. AR 42. He stated that he was being treated with Paxil, an anti-depressant. *Id.* Agan estimated that he suffered from anxiety and depression since he lost his job in 2008, and although his medication helped, he still experienced symptoms. AR 43.

During the hearing, Agan rotated between sitting down and standing up. AR 44. When the ALJ asked why he kept changing positions, Agan stated that because of the chronic pain in his back, he was only able to sit in a chair for about 15 to 20 minutes. *Id.* He could then stand or walk around for 15 to 20 minutes before he needed to sit down again. *Id.* Agan testified that he thought he could walk about one block without experiencing pain or discomfort. AR 44-45. He also thought he could stand in one place for about 15 minutes before experiencing pain or discomfort. AR 45. Agan's other limitations included grasping or gripping things due to the gout in his right hand. *Id.*

Agan's activities of daily living were also discussed at the hearing. AR 46. He stated that he tries to maintain the house he lives in with his wife and two daughters as best as he can by loading the dishwasher and doing laundry. *Id.* He stated he is able to take care of his personal needs and

can drive, but only for short trips. AR 47. He testified that he goes to the grocery store about once a week with his wife but stays in the car most of the time. *Id.* Agan later clarified that he was only able to get out of the house and do activities on good days and that he experiences approximately 10 to 12 bad days per month. AR 49. He said he uses a walker to get out of bed or off the couch, but he is able to walk without it. AR 48.

### B. VE's Testimony

Marian Jacobs also testified at the hearing. The ALJ asked her to consider four hypotheticals to determine what type of work Agan could perform and if these jobs were available in the regional and national economy. First, the ALJ asked her to consider whether a person could perform any of Agan's past work given the following qualifications and limitations: the same age, education, and past work experience as the claimant, who could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and walk six hours out of an eight-hour day, could sit for six hours out of an eight-hour day, and could occasionally balance, stoop, crouch, kneel, crawl, and climb, but could not climb ladders, ropes, or scaffolding. AR 52. The VE testified that a person with these qualifications and limitations would not be able to perform any of Agan's past work. *Id.* However, she believed a person with the skills the claimant had acquired in his past work could perform the job of order filler in a wholesale company or a parts clerk in a retail store within the limitations of the first hypothetical. AR 52–53. Light unskilled jobs such as an assembler, bottle inspector, or router could also be performed and were available in substantial numbers in Iowa and the United States. AR 53.

For the second hypothetical, the ALJ asked if a person could perform any of Agan's past work if that person could stand and walk only two hours out of an eight-hour workday. The VE answered "no" and stated that no sedentary jobs were available which required the skills the

claimant had acquired in his past work. AR 54. As for unskilled sedentary jobs, the VE indicated that dresser and sorter of envelopes and packages, assembler of buttons and notions, and final assembler of optical frames would be appropriate and existed in substantial numbers in the regional and national economy. AR 54–55.

For the third hypothetical, the ALJ asked the VE to consider the sedentary hypothetical with the addition that the person would need to alternate sitting and standing every 15 to 20 minutes. AR 55. The VE stated that such an individual could not perform work in a competitive economy.

Finally, the ALJ had the VE consider the sedentary hypothetical with the additions that the person would need to take more than two unscheduled breaks per day and work at a slow pace for up to one-third of the day. *Id.* The VE testified that such a person could not perform work in a competitive economy. *Id.* She clarified that her answer remained the same regardless of the exertional level or if each of those three limitations were taken singly. AR 56.

### 3.    *Summary of the ALJ's decision*

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2) The claimant has not engaged in substantial gainful activity since July 22, 2008, the alleged onset date.

(3) The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, status post lumbar fusion and status post implantation and removal of spinal neurotransmitter.

(4) The claimant does not have an impairment or combination of impairments that meets or medically

equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) such that he could lift twenty pound[s] occasionally and ten pounds frequently, and could stand/walk for six hours out of an eight-hour workday. He could sit for six hours out of an eight-hour workday. He can only occasionally balance, stoop, crouch, kneel or climb. He cannot climb ladders, ropes, or scaffolds.

(6) The claimant is unable to perform any past relevant work.

(7) The claimant was born on December 13, 1960 and was 47 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age.

(8) The claimant has at least a high school education and is able to communicate in English.

(9) The claimant has acquired work skills from past relevant work.

(10) Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.

(11) The claimant has not been under a disability, as defined in the Social Security Act, from July 22, 2008, through the date of this decision.

AR 15–21.

In evaluating Agan's impairments, the ALJ considered both mental and physical impairments. The ALJ recognized that Agan's medically determinable mental impairments included alcohol abuse, anxiety, and depression. AR 16. However, he concluded that considered singly and in combination, these did not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and were therefore non-severe. *Id.* The ALJ used the "paragraph B" criteria set out in 20 CFR, Part 404 Subpart P, Appendix 1, which consists of four broad functional areas. *Id.* He found that in the areas of activities of daily living, social functioning, and concentration, persistence, and pace, Agan had mild limitations from his mental impairments. AR 16. He also found that Agan had no episodes of decompensation of extended duration. *Id.* In making these findings, the ALJ noted Agan's statement to a physician that he drank a 12-pack of beer per day. He also acknowledged that Agan had intentionally overdosed on his medications in October 2009 and in June 2010, but that he was stabilized and released home shortly thereafter. *Id.* In concluding that Agan's mental impairments were nonsevere, the ALJ explained:

> The record reflects minimal treatment for mental health conditions and the brief hospitalizations appear to be isolated events. The claimant's physical conditions appeared to be the focus of treatment notes, with only sporadic mention that the claimant received medication for depression. There are no treatment notes that indicate a mental health specialist has placed any type of limitations on the claimant due to mental health conditions.

*Id.*

The ALJ also addressed Agan's physical impairments, including diabetes mellitus and hyperlipidemia. He concluded that because both of these impairments could be effectively controlled through medication and did not

have more than a minimal effect on his ability to perform basic work activities, they were non-severe. AR 16–17.

The ALJ also found that the pain and discomfort in Agan's hand was a nonmedically-determinable impairment. AR 17. The ALJ noted that there was no objective medically-acceptable testing that could establish an impairment, and he also relied on Dr. Guatam Kakade's evaluation where he concluded after extensive testing, "I am at a loss to find an appropriate diagnosis for his pain and discomfort." *Id.*

In determining Agan's RFC, the ALJ evaluated the credibility of Agan's subjective allegations. AR 17–19. He found that the record did not fully support the severity of Agan's allegations and that treatment seemed to have resolved or greatly reduced the majority of his complaints, as the medical evidence failed to document a continued pattern of complaints of recurrent symptoms. AR 19. He also found that Agan required little ongoing medical treatment for his back pain, as evidenced by the record. *Id.*

The ALJ gave great weight to the opinions of the State Agency medical consultants' opinions finding that they were internally consistent and consistent with the evidence as a whole. *Id.*

Report And Recommendation 2–19 (docket no. 10). I adopt Judge Strand's findings of fact, as the parties have not objected to them.

## II.     ANALYSIS

### A.     Standard Of Review

I review Judge Strand's Report And Recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

> the court may accept, reject, or modify, in whole or in part,
> the findings or recommendations made by the magistrate
> judge. The judge may also receive further evidence or
> recommit the matter to the magistrate judge with
> instructions.

28. U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article
> III judge of any issue need only ask. Moreover, while the
> statute does not require the judge to review an issue *de novo*
> if no objections are filed, it does not preclude further review
> by the district judge, *sua sponte* or at the request of a party,
> under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential

review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask."). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will

strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The United States Supreme Court has stated that the "foremost" principle under the "clearly erroneous" standard of review "is that '[a] finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[4]

_____

[4] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the

Here, Agan has objected to several of Judge Strand's findings. Although I will review these findings *de novo*, and Judge Strand's other findings for clear error, I review the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." (quoting *Haggard*, 175 F.3d at 594)). "If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the

---

plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Commissioner's findings, [the court] must affirm the denial of benefits." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

## B.     *Agan's Objections*

In his objections, Agan challenges Judge Strand's finding, and subsequent recommendation, that there is substantial evidence in the record to support the ALJ's determination that Agan is not disabled. Specifically, the ALJ found that Agan has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) such that he could lift twenty pounds occasionally and ten pounds frequently, he could stand/walk for six hours out of an eight-hour workday, he could sit for six hours out of an eight-hour workday, and he could only occasionally balance, stoop, crouch, kneel or climb; and he cannot climb ladders, ropes, or scaffolds. Agan objects to Judge Strand's Report And Recommendation, arguing (1) the ALJ failed to properly evaluate Agan's subjective allegations utilizing the *Polaski* standard and (2) the ALJ failed to fully and fairly develop the record by not obtaining work-related limitations from a treating or examining source and Agan's mental health records or a consultative evaluation. In support of his objections, Agan argues that "[t]he evidence is not so strongly against the claimant's position that the Court can assume the ALJ's errors are harmless." Plaintiff's Objections at 20 (citing *Pope v. Bowen*, 886 F.2d 1038, 1040 (8th Cir. 1989)).

### 1. *The ALJ's credibility determination*

Agan maintains that the ALJ, in making his credibility determination, failed to properly evaluate Agan's subjective allegations under the *Polaski v. Heckler* standard. Specifically, Agan brings up the following issues in his objections: the reliance on the silence of the treating physicians, the failure to recognize objective medical evidence, the subjective nature of back pain, Agan's loss of health insurance, work history, and Agan's age category.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). When evaluating a claimant's subjective complaints, an ALJ must employ the multi-factor standard articulated by the Eighth Circuit Court of Appeals in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which examines "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009), in turn citing *Polaski*, 739 F.2d at 1322). Nonetheless, "[t]he ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* at 932 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). Rather, "[t]he ALJ need only acknowledge and consider those factors before discounting a claimant's subjective complaints." *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). The ALJ may also consider "the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931–32 (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)). Additionally, "acts which are inconsistent with a claimant's

assertion of disability reflect negatively upon that claimant's credibility," *id.* at 932 (citing *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)), and the ALJ may discredit "a claimant's subjective complaints if there are inconsistencies in the record as whole,'" *id.* (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008)). The failure to seek medical treatment may reflect adversely on the credibility of a claimant's subjective complaints. *See Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 2008)). Courts generally defer to an ALJ's credibility finding when the ALJ "'explicitly discredits the claimant's testimony and gives good reason for doing so.'" *Halverson*, 600 F.3d at 932 (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)). The Eighth Circuit Court of Appeals has cautioned judges against "substitut[ing] [their] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590 (citing *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996)).

### a. *Lack of functional restrictions*

Agan contends that Judge Strand erroneously "asserted that the silence of the treating physicians supported the ALJ's determination." Plaintiff's Objections at 2; *see Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011) ("[A] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when the doctor did not discharge the claimant from treatment."). Agan suggests that the lack of restrictions cannot be used to discount his claim because the treating physicians were not asked to render an opinion on his work capacity.

The ALJ considered the *Polaski* factors, particularly Agan's own description of his activities and limitations. *See Howard v. Astrue*, No. 4:10 CV 1389 JCH, 2011 WL 4007936, at *7 (E.D. Mo. Sept. 8, 2011) (holding that the ALJ may not base his

functional determination solely on the silence of the claimant's physicians). The ALJ properly observed that Agan's self-reported daily activity limitations were inconsistent with the lack of significant restrictions imposed by a treating physician. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (finding that the lack of significant medical restrictions is inconsistent with complaints of disabling pain). As Judge Strand observed, "[s]elf-imposed limitations without medical support in the record can be a basis for discrediting the claimant's allegations." Report and Recommendation at 25 (citing *Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007)). I find it significant that none of Agan's treating physicians ever indicated he could not or should not work. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [the claimant] submitted a medical conclusion that [he] is disabled and unable to perform any type of work."). The only relevant work restriction in the record is from Agan's October 2008 post-surgery exam with Dr. Galloway in which she restricted him to "no lifting greater than 30 pounds with limited bending and twisting." AR 275. There are no subsequent restrictions from Agan's doctors in the record. Therefore, the ALJ did not err in adversely considering the lack of any significant restrictions imposed by a treating physician, as part of the overall credibility assessment.

### b. *Objective medical evidence and daily activities*

Agan argues that Judge Strand and the ALJ failed to recognize that the objective medical evidence and Agan's daily activities are consistent with a finding of disability. Judge Strand properly determined that this argument reflects the wrong standard of review. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, I must affirm the denial of benefits. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). Since the Commissioner's decision does

not fall "outside the available 'zone of choice,'" I will not disturb the finding of no disability. *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citing *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

First, the ALJ considered Agan's active daily living activities as a factor in the credibility analysis, not the sole consideration. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[a]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). In May 2009, Agan reported that he went on daily, one-mile walks. AR 18, 206. He also went grocery shopping, did laundry, and mowed the lawn. AR 208-09. Agan reported that he did yard work in August 2009 (AR 18, 383) and mowed the lawn in August 2010 (AR 478, 480), where he was limited by muscle strain and acid reflux, not back pain. AR 383, 475, 478. At the hearing, he testified that he tries to maintain the house by loading the dishwasher and doing laundry. AR 46. He also testified that he is able to take care of his personal needs and can drive for short trips. AR 47. After assessing Agan's daily activities, the ALJ determined that his activity level was inconsistent with his allegations of disabling pain.

Second, Agan argues that the ALJ failed to recognize objective evidence, including the uncertainty of further treatment alternatives, Agan's fall in October 2008, and the 2008 CT scan revealing severe facet degenerations at L4/L5. The ALJ concluded, after considering the *Polaski* standard, that "the objective findings in this case failed to provide strong support for the claimant's allegations of disabling symptoms and limitations." AR 18. The ALJ considered the objective medical evidence in the record, concluding that Agan's back surgeries in April 2005, December 2008, and July 2008 appear "to have resolved or greatly reduced the majority of the claimant's complaints. Although the claimant initially complained of some recurrent symptoms, the medical evidence failed to document a continued pattern of complaints.

Significantly, the claimant appears to have required limited ongoing medical treatment for back pain." AR 19; *see* 20 C.F.R. § 404.1529(c)(3)(v). The ALJ found that Agan "experiences some symptoms and limitations; however, the record does not fully support the severity of the claimant's allegations." AR 19; *see Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) ("An ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."). Agan's assertion about the uncertainty of further treatment alternatives is irrelevant because the evidence shows that, despite some lingering pain, the surgeries mostly resolved Agan's complaints. Although Agan fell in October 2008, the record shows that, at that time, he only reported "occasional [back] stiffness, but overall he [was] doing better," physical therapy "really helped," and he was "ready to go back to work." AR 275. At subsequent appointments in December 2009, January 2010, February 2010, and March 2010, he did not report back pain. Report and Recommendation at 27. Also, the facet degenerations, may have been a source of pain, but the ALJ considered it in the totality of the record, and it appears to have been controlled by medication. AR 287, 302–303.

In assessing the objective medical evidence, Judge Strand provided a detailed summary of Agan's treatment history, illustrating a pattern of back pain complaints only when he needed refills on his medications. Report And Recommendation at 26–28; AR 390. Judge Strand also discussed Agan's intentional overdose on Tramadol in October 2009 and the drug-seeking education he received from the nurse practitioner. AR 379, 461, 468. As Judge Strand observed, "This pattern seems to indicate that Agan's back problems were substantially controlled by medication or that he was seeking medication for reasons other than his back pain." Report And Recommendation at 28. It appears from the record that Agan's back pain was controlled by treatment, which does not support a finding of disability. *See Hutton v.*

*Apfel*, 175 F.3d 651, 655 (8th Cir. 1999). I agree with Judge Strand's analysis of Agan's drug-seeking behavior, in which he observed that it "cast[s] a cloud of doubt" over the legitimacy of Agan's doctor visits and allegations of disabling pain. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

The ALJ's findings of inconsistencies in Agan's daily activities and the lack of objective medical evidence to support Agan's alleged disabling impairments is supported by substantial evidence in the record. Therefore, the ALJ did not err in his analysis of the objective medical evidence and daily activities.

### c.    *Subjective nature of back pain*

Agan contends that Judge Strand and the ALJ "fail[ed] to recognize the inherently subjective nature of much back pain." Plaintiff's Objections at 4. Agan cites to medical journals, but he does not provide any support to show how Judge Strand or the ALJ allegedly failed to understand the inherently subjective nature of back pain. While pain in general may be difficult to describe or quantify, the ALJ properly considered Agan's back pain from Agan's own reports, as well as the objective medical evidence in the record. *See Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) ("An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole."). Agan quotes *Landness v. Weinberger* to assert that "disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being. Different people react in markedly different ways to similar injuries. A back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to age, obesity, deformity, or general physical well-being is generally deteriorated." 490 F.2d 1187, 1190 (8th Cir. 1973). I absolutely agree with these considerations. As the court

in *Flaherty v. Halter* explained, "[g]iven this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as whole." 182 F. Supp. 2d 824, 847 (D. Minn. 2001). Here, the ALJ analyzed the record as a whole and determined that "the record does not fully support the severity of the claimant allegations." AR 19. Thus, the ALJ did not fail to recognize the subjective nature of back pain.

### d. Loss of health insurance

Agan also objects to the ALJ's failure to address his loss of health insurance around February 2009 as a basis for his limited treatment. Agan cites to the treatment notes from Agan's post-surgery appointment in August 2008, where the provider noted that Agan was not taking Avadia for his diabetes because of the cost, but he was taking insulin. AR 244–45. This reference, in 2008, does not support Agan's objection on the loss of insurance, because it occurred before he lost his insurance. Agan also cites to the disability report where Agan noted that, when he sought treatment in July 2009 for diarrhea, his provider at United Community Health Center wanted to do a CT scan, but Agan could not afford the procedure. AR 230.

Loss of health insurance is a significant burden, especially for an individual like Agan who is afflicted with a variety of ailments. In *Tome v. Schweiker*, the Eighth Circuit Court of Appeals reversed the district court's finding of no disability because the claimant "did not consciously decide not to follow 'doctor's orders,' but rather lacked the financial resources and the discipline and education needed to understand and follow her [medical regime]." 724 F.2d 711, 713–14 (8th Cir. 1984). In *Benskin v. Bowen*, the Eighth Circuit Court of Appeals was less willing to find the lack of financial resources an appropriate excuse when the claimant "did not testify that financial concerns deterred her from seeking less costly medical attention." 830 F.2d 878, 884 (8th Cir. 1987). Here, the ALJ and Judge Strand did not use Agan's inability

to afford medical services as a basis for his denial of benefits. *See Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000). This objection does not apply to the facts at hand because Agan did not fail to seek medical attention, *Benskin*, 830 F.2d at 884, or follow prescribed treatment, *Tome*, 724 F.2d at 713. After losing his insurance, Agan continued to seek medical treatment for his impairments at several different medical centers, including the sliding fee schedule community clinic in Storm Lake. AR 373–99, 457–70. I find it significant that Agan did not testify that there were medical services for his back pain that he needed but stopped seeking because of his loss of insurance. As part of the credibility analysis, the ALJ considered Agan's infrequent and conservative treatment, not his failure to seek treatment. Therefore, the ALJ and Judge Strand did not err in failing to address Agan's loss of health insurance as a basis for his limited treatment.

### e. *Work history*

Agan objects to Judge Strand's evaluation of Agan's work history in which Judge Strand observed that continuing to work with an alleged disability and applying for unemployment benefits undermines Agan's credibility. Report And Recommendation at 29. Agan contends that the ALJ did not consider this matter in his credibility analysis, and I should not rely on this evidence since the ALJ did not rely on this basis. Agan relies on the rule upheld in *HealthEast Bethesda Lutheran Hospital and Rehabilitation Center v. Shalala*, 164 F.3d 415 (8th Cir. 1998) that a reviewing court may not uphold an agency's decision based upon reasons the agency failed to articulate when "the agency [has] fail[ed] to make a necessary determination of fact or policy" upon which the court's alternative basis is premised. *HealthEast*, 164 F.3d at 418 (discussing the limitations on the rule dictated in *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 63 S. Ct. 454 (1943)); *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir.2001).

Here, the ALJ did not fail to make a necessary finding of fact or policy. Although the evidence of Agan's application for unemployment benefits was not "expressly cited by the ALJ" in the section of the decision discussing Agan's work history, they are part of the administrative record and were considered by the ALJ. *Bondurant v. Astrue*, 2010 WL 889932. *2 (D. Minn 2010) (holding that claimant's argument that magistrate judge engaged in post hoc rationalizations to affirm the ALJ's decision is without merit because the evidence was part of the administrative record). "To the extent [the magistrate judge], upon thoroughly considering the record as a whole, articulated additional reasons to support the ALJ's conclusion, the additional reasons do not result in a substitution of his view for the ALJ's view of the evidence." *Telin v. Astrue*, 2012 WL 6194353, *2 (D. Minn. 2012). The ALJ's decision states that he "carefully considered all the testimony at the hearing, the arguments made, and the documents identified in the record" and "[t]he testimony at the hearing and the exhibits of record are incorporated" in his decision by reference. AR 13. Although the ALJ did not specifically discuss this evidence of unemployment benefits in his decision, the ALJ considered this evidence as part of the hearing and the record. AR 33, 183-84, 186-87, 188-90, 257, 271. In his Report And Recommendation, Judge Strand properly considered the record as a whole.

Agan's argument is without merit. However, even if his objection were valid, it would have no effect on the result, since Judge Strand's discussion merely bolsters the ALJ's credibility assessment and there are many other significant factors supporting the credibility determination. Thus, Judge Strand did not err in discussing the claim for unemployment compensation as part of the credibility discussion in the Report And Recommendation.

### f.     Age category

Agan argues that Judge Strand failed to consider that Agan jumped up an age category shortly after he became disabled.  If a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, [the agency] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case."   20 C.F.R. § 404.1563(b).

However, this argument is unfounded because the ALJ clearly considered the change in age category, since he specifically made note of the age change.  AR 20.  The ALJ acknowledged that Agan "was born on December 13, 1960, and was 47 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. 404.1563)."  AR 20.   Agan misleadingly cites Vocational Rules 201.09, .10, .12, and .14, which do not reflect Agan's vocational situation.  AR 15–21.  The ALJ applied the framework of Vocational Rule 202.22 for the younger individual category and Vocational Rule 202.15 for the closely approaching advanced age category, which both result in a finding of "not disabled" according to Agan's vocational limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 2. ("Table No. 1—Residual Functional Capacity: Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)).  Thus, the age category does not change the decision on Agan's disability, and the ALJ properly considered Agan's age category change in his analysis.

Therefore, because substantial evidence in the record as a whole supports the ALJ's decision to discount Agan's subjective complaints of limitations arising from his back pain, I find that the ALJ's credibility determination was proper.  *See Page*, 484

F.3d at 1042. I will not "substitute [my] opinion for that of the ALJ, who is in a better position to assess credibility." *Eichelberger*, 390 F.3d at 590.

## 2. The ALJ's development of the record

Agan argues that the ALJ and Judge Strand failed to fully and fairly develop the record with respect to the work-related limitations from a treating or examining source, Agan's diabetic peripheral neuropathy, and the evidence of mental impairments. An ALJ has a duty to develop the record fully and fairly, independent of the claimant's burden to press her case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). A social security hearing is a non-adversarial proceeding, and the ALJ must develop the record so that "deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

### a. Work-related limitations

Agan alleges the ALJ failed to obtain work-related limitations from a treating or examining source. The ALJ must determine a claimant's RFC based on all the evidence including "medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guillams*, 393 F.3d at 803. An ALJ may need to order medical examinations and tests when the medical evidence in the record is insufficient to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994).

Agan relies on *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) to support his argument that the ALJ erred by failing to obtain work-related limitations from a

treating or examining source. In *Nevland*, the court reversed and remanded the case because "there is no medical evidence about how [the claimant's] impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion." *Nevland*, 204 F.3d at 858. Here, the ALJ's RFC assessment is supported by substantial evidence in the record. The ALJ did not rely solely on non-treating doctors to form an opinion on Agan's RFC. *See Dixon v. Barnhart*, 324 F.3d 997, 1002 (8th Cir. 2003). The ALJ's determination is based on all the evidence in the record, including "the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 760, 863 (8th Cir. 2000).

In particular, the ALJ considered medical evidence following Agan's last back surgery in 2008, which indicated that he was "doing very well post-operatively." AR 279–80. Physical examinations following his surgery indicated normal functioning of his extremities. AR 271, 275, 279. Agan completed two weeks of physical therapy for three times a week followed by work hardening for two weeks. AR 279–80. In October 2008, Agan returned to work part-time and the physician assistant suggested a limitation of "no lifting over 30 pounds and limited bending and twisting." AR 275–76. By November 2008, Agan was working full-time with no limitations noted at his follow-up exam. AR 71–72. Aside from the post-surgery limitations on lifting, bending, and twisting, there are no functional limitations in the record and no indication of worsening condition. The post-surgery medical records only noted tenderness of the spine. AR 380-81, 389, 459. Agan's complaints of back pain were related to medication refills or new injuries that provoked his back pain. AR 380, 386, 389, 433. The ALJ relied on medical evidence from the post-operative evaluations to ascertain additional work-related limitations. *See Cox v. Astrue*, 495 F.3d 614, 620 n.6 (8th Cir.

2007) (explaining that an explicit reference to "work" is unnecessary when the "evaluations describe [the claimant's] functional limitations with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment"). The medical evidence, including physical examination treatment notes from the treating physicians, provide sufficient support for a finding that Agan was able to function in the workplace. The ALJ's RFC determination includes significantly more limitations than Agan's single, post-operative limitation, reflecting a thorough consideration of Agan's subjective allegations and the medical evidence of his degenerative disc disease. I agree with Judge Strand that no further development of the record was necessary for the ALJ's RFC determination.

### b.    *Agan's diabetic peripheral neuropathy*

Agan also contends the ALJ should have developed the record more concerning the limitations of Agan's diabetic peripheral neuropathy. In particular, Agan refers to a treatment note before his surgery in which the doctor opined that it was unclear how much the numbness and tingling could be attributed to Agan's peripheral neuropathy. However, the ALJ determined that Agan's diabetes mellitus is a non-severe impairment. AR 16. The ALJ concluded, "After receiving medication and diabetic counseling, his symptoms appeared to be stable and do not have more than a minimal effect on his ability to perform basic work activities." AR 16–17. A "severe impairment" is defined as one which "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The ALJ analyzed the medical record concerning Agan's diabetes mellitus and diabetic peripheral neuropathy, which indicated that Agan "has some mild sensory deficits consistent with diabetic peripheral neuropathy," but it was never the focus of his treatment. AR 400. I agree with Judge Strand that the record contains substantial evidence supporting the

ALJ's finding that Agan's diabetic peripheral neuropathy was a non-severe impairment that did not require further development by the ALJ.

### c.    *Evidence of mental impairments*

Agan also argues that the ALJ failed to fully develop the record regarding the evidence of mental impairments.  First, Agan contends the ALJ should have requested the treatment records from Berryhill, where he received treatment for anxiety and depression for the five months prior to the administrative hearing.  Second, Agan argues the ALJ should have ordered a consultative evaluation to help determine whether Agan's mental impairments were severe.

"Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment."  *Partee v. AStrue*, 638 F.3d 860, 864 (8th Cir. 2011).  The ALJ must consider four broad functional areas to determine whether the claimant's mental impairments are severe, including "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."  *Anderson*, 51 F.3d at 779 (quoting *Naber*, 22 F.3d at 189).  An ALJ "is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'"  *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)).

Here, the ALJ considered the four functional areas in assessing Agan's mental impairments, pursuant to 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). AR 16.  The ALJ acknowledged that Agan suffered from chronic alcoholism, depression, and

anxiety; however, none of these issues were alleged in Agan's disability application. AR 16, 195. The ALJ also observed that Agan intentionally overdosed on Tramadol in October 2009 and benzodiazepines in June 2010, but was stabilized and released home on both occasions. AR 16. The ALJ concluded:

> The record reflects minimal treatment for mental health conditions and the brief hospitalizations appear to be isolated events. The claimant's physical conditions appeared to be the focus of treatment notes, with only sporadic mention that the claimant received medication for depression. There are not treatment notes that indicate a mental health specialist has placed any type of limitations on the claimant due to mental health conditions.

AR 16.

During the hearing, the ALJ inquired about the treatment Agan received at Berryhill, which Agan said helped with his anxiety and depression, but he still had symptoms. AR 42-43. In Agan's brief, he suggests that his attorney was not aware the Berryhill records were missing. Agan's Brief at 20. However, the claimant has the initial burden of producing evidence. *See* 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled."). The ALJ "will make every reasonable effort to help [the claimant] get medical reports" when the claimant gives the ALJ permission to request the reports. 20 C.F.R. § 404.1512(d). The ALJ is required to obtain additional evidence "only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010).

There was sufficient medical evidence in the record for the ALJ to determine that Agan's mental impairments were non-severe without requesting additional evidence or a consultative examination. I agree with Judge Strand's reasoning in the Report and

Recommendation. First, Agan failed to allege mental impairments in his application for benefits. AR 195. Although he added a new mental limitation in his appeals report in July 2009, he indicated there were no changes in daily activities as the result of the new limitation. AR 229. Second, depression was not the focus of any treatment in the record, but mentioned only with regard to medication. AR 385 (sought treatment for diarrhea in July 2009, not depression). Third, after Agan's two suicide attempts, his medication and treatment remained relatively the same. AR 402, 432. Agan's depression and anxiety appear to be controlled primarily through medication. At the hearing, Agan said the new anti-depressant from Berryhill helped, although he still experienced symptoms. AR 42. Also, his mental impairments are not identified as the cause of Agan's limitations. Agan explained that he was not able to work because of his back pain. AR 35. Thus, there is substantial evidence in the record to support the ALJ's conclusion that Agan's mental impairments were non-severe and did not require further development.

### III.    CONCLUSION

THEREFORE, I find that the ALJ's determination that Agan is not disabled is supported by substantial evidence in the record as a whole. Judge Strand recommended that the ALJ's decision be affirmed and that judgment be entered in favor of the Commissioner and against Agan. I agree and thus **accept** Judge Strand's Report And Recommendation (docket no. 10). The Commissioner's decision is **affirmed**. The clerk is directed to enter judgment in favor of the Commissioner and against Agan.

**IT IS SO ORDERED**.

**DATED** this 7th day of February, 2013.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA